ProAssurance Companies
100 Brookwood Place
Birmingham, AL 35209

P.O. Box 590009
Birmingham, AL 35259-0009
800-282-6242 • 205-802-4710 fax
www.proassurance.com



April 12, 2024

RE:     Insured:         Michael McGee, M.D.
        Policy No.:       MP116894
        Policy Period:   1/1/2022 to 1/1/2023
        Claim No (s).:   CLM0005143, CLM0005760

I, Lynette Muhle, do hereby confirm that, to the best of my knowledge and belief, the attached documents are true and exact copies of policy document covering Michael McGee, M.D. for the policy period listed above and stored in the ProAssurance Indemnity Insurance Company's operating system.   The documents have been redacted to exclude information that is confidential or not relevant to the current request.

Sincerely,

Lynette Muhle
Senior Credentialing Specialist

EXHIBIT B

# MERGER AND COMPANY NAME CHANGE ENDORSEMENT

**POLICYHOLDER:**
**ENDORSEMENT EFFECTIVE DATE:**
**POLICY NUMBER:**

The **policy** is hereby amended as follows:

I.   The company name, formerly ProAssurance Casualty Company, wherever it appears in this **policy**, is hereby amended to read:

   ProAssurance Indemnity Company, Inc.

II.  **Our** address, wherever it appears in this **policy**, is amended to read:

   100 Brookwood Place
   Birmingham, Alabama 35209

III. **Our** phone number, wherever it appears in this **policy**, is amended to read:

   (800) 282-6242

IV.  **Our** domicile state, wherever it appears in this **policy**, is amended to read:

   Alabama

V.   ProAssurance Indemnity Company, Inc. has assumed all of ProAssurance Casualty Company's legal obligations, including this **policy**. The **insured** does not have to take any action. All premiums now or hereafter due on this **policy** are payable to ProAssurance Indemnity Company, Inc. All other terms and benefits of this **policy** remain unchanged.

Merger and Company Name Change Endorsement
©2023 ProAssurance Corporation

# HEALTH CARE PROFESSIONAL LIABILITY POLICY
# COVER PAGE

---

**THIS POLICY CONTAINS COVERAGES WRITTEN ON A "MODIFIED CLAIMS-MADE" BASIS.**

---

In consideration of the payment of the premium, and in reliance upon the statements and representations in the applications for insurance and the **Coverage Summary, we** agree to provide the insurance contained in the **policy**.

**THE COMPANY:** ProAssurance Casualty Company
100 Brookwood Place, Suite 300
Birmingham, AL 35209

**AGENT:** Jack W. Brodt Agency, Inc.
7300 France Ave. So.
#402
Edina,  MN  55435
(952) 830-0032

**POLICYHOLDER:**  River Valley Forensic Services PA
300 East University Avenue
Saint Paul, MN 55130

**POLICY NUMBER:** MP116894

The **policy** consists of this **Cover Page** and the following forms (together with any endorsements issued from time to time).

| Title | Form Number |
|---|---|
| Coverage Summary | PRA-HCP-020 06 10 |
| Healthcare Professional Liability Policy | PRA-HCP-031 01 12 |
| Legal Expense Coverage Part | PRA-HCP-072 10 15 |
| Medicare/Medicaid Billing Errors & Omissions Endorsement | PRA-HCP-082 01 12 |
| Unscheduled Paramedical Employee Endorsement | PRA-HCP-360 06 07 |
| Renewal Endorsement | PRA-HCP-500 08 05 |
| Minnesota State Amendatory Endorsement | PRA-HCP-606.MN 01 19 |
| CyberAssurance Endorsement | PRA-HCP-700.MN 01 16 |

If any provision of the **policy** changes, **we** will issue an endorsement stating the effective date of any changes. Terms appearing in the **policy** in **bold face print** are defined in the Definitions section.

IN WITNESS WHEREOF,  **we** have caused the **Cover Page** to be signed by **our** President and Secretary.

KATHRYN A. NEVILLE, J.D., CPCU
Secretary

MICHAEL L. BOGUSKI, CPCU
President

# HEALTHCARE PROFESSIONAL LIABILITY POLICY COVERAGE SUMMARY

1. Policyholder's Name and Address:

   River Valley Forensic Services PA
   300 East University Avenue
   Saint Paul, MN 55130

2. Policy Number: MP116894

3. Policy Period:  From 1/1/2022 to 1/1/2023 12:01 a.m. at the address of the **policyholder** as stated above.

4. Total Premium: ▮▮▮▮▮▮

5. Schedule of Insureds (Primary Coverage)
   The following are **insureds** under the **policy**, with the following respective limits of liability:

### Primary Limits of Liability

| Name | Retroactive Date | Each Professional Incident | Annual Aggregate | Deductible | Premium |
|------|------------------|----------------------------|------------------|------------|---------|
| INSURED ORGANIZATIONS | | | | | |
| River Valley Forensic Services PA | 1/1/2020 | $1,000,000 | $3,000,000 | ▮▮▮▮▮▮ | |
| INSURED PROFESSIONALS | | | | | |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | | | | | |
| Michael Boyd McGee, M.D. | 3/1/1986 | $1,000,000 | $3,000,000 | ▮▮▮▮▮▮ | |

6. Schedule of Insureds (Additional Coverage)
   The following **insureds** have the following respective additional limits of liability:

### Additional Limits of Liability

| Name | Retroactive Date | Each Professional Incident | Annual Aggregate | Premium |
|------|------------------|----------------------------|------------------|---------|
| INSURED ORGANIZATIONS | | | | |
| River Valley Forensic Services PA | 1/1/2020 | $1,000,000 | $1,000,000 | ▮▮▮ |
| INSURED PROFESSIONALS | | | | |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | | | | |
| Michael Boyd McGee, M.D. | 1/1/2010 | $1,000,000 | $1,000,000 | ▮▮▮ |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | | | | |

# HEALTH CARE PROFESSIONAL LIABILITY POLICY
# CLAIMS-MADE FORM

As used in this **policy**, the following terms shall have the following meanings:

**Assertion of liability** means an oral or written demand or notice from a patient or a patient's representative claiming that an **insured** is liable for a **professional incident** or requesting a patient's medical or dental records.

**Continuous coverage effective date** means the effective date of the earliest **policy** issued by **us** or any of **our** corporate affiliates to the **insured**, which **policy** is followed by a continuous and unbroken period in which **we** provided professional liability insurance coverage to the **insured**.

**Cover Page** means the Healthcare Professional Liability Policy Cover Page, or any renewal or modification thereof.

**Coverage Summary** means the Healthcare Professional Liability Policy Coverage Summary, or any renewal or modification thereof.

**Damages** means all amounts of money which are payable under this **policy** because of injury, including death.

**Insured** means any **insured organization**, any **insured professional**, any **insured paramedical employee**, and any **other covered employee**.

**Insured organization** means any partnership, professional corporation, professional association, limited liability company, or other entity designated as an **insured organization** in the **Coverage Summary**.

**Insured paramedical employee** means any person designated as such in the **Coverage Summary**.

**Insured professional** means any dentist or physician designated as an **insured professional** in the **Coverage Summary**.

**Other covered employee** means any employee of an **insured** in a professional medical or dental practice setting other than (1) a person practicing as a physician, surgeon, dentist, psychologist, nurse midwife, nurse anesthetist, nurse practitioner, physician assistant, surgeon assistant, perfusionist, optometrist, cytotechnologist, emergency medical technician, or anesthesiologist assistant, or (2) any person licensed, certified, or otherwise authorized to deliver advanced level healthcare in the absence of direct supervision by a licensed physician.

**Other insurance** means any valid and collectible insurance, self insurance, self-insured retention, self-insured trust, or risk transfer instrument of any kind, other than this **policy**, that provides defense or indemnity to any **insured** for any claim, loss, liability, or **damages** covered by this **policy**.

**Peer review services** means service by an **insured professional** while acting within the scope of his or her duties as a member of:

    A.   a utilization and quality control peer review organization acting under contract with a federal or state healthcare agency to review the professional activities of healthcare providers;

    B.   a duly constituted hospital, surgery center or long-term healthcare facility utilization review committee providing review of services furnished by the institution and members of its medical or dental staff;

    C.   a duly constituted hospital, surgery center, or dental center staff committee, consisting solely of members of the medical or dental staff of the hospital, surgery center, or dental center for the evaluation and improvement of quality of care;

    D.   a duly constituted hospital peer review committee, consisting solely of members of the medical or dental staff of the hospital, having responsibility for: (1) reviewing qualifications and credentials of persons seeking appointment or reappointment to a hospital medical staff, (2) evaluating the clinical or administrative competence of persons so appointed, (3) matters concerning limiting the scope of hospital privileges of persons on a hospital medical staff, or (4) matters concerning the dismissal or discharge of persons from a hospital medical staff; or

    E.   any peer review program conducted by **us**; and

    F.   with respect to dentists only, a duly constituted dental society peer review committee having responsibility for evaluating the performance of services of other dentists or dental auxiliary personnel at the request of government agencies, patients, dentists, providers of dental benefits, or third party insurers.

**Permanent and total retirement** means that an **insured professional** no longer performs any medical, dental, or

professional activities or duties for which a medical or dental license is required and for which the **insured professional** receives monetary or other financial compensation. **Permanent and total retirement** does not include termination of professional practice due to revocation of license or criminal prosecution.

**Policy** means the **Cover Page**, the forms listed thereon, and any endorsements issued from time to time. The **policy** terms in effect at the time a **professional incident** is first **reported** shall apply to that **professional incident**.

**Policyholder** means the person or entity designated as such in the **Coverage Summary**.

**Policy period** means the period specified as such in the **Coverage Summary**.

**Professional incident** means:

    A.    a single act or omission, or a series of related acts or omissions during a continuing course of **professional services**, arising out of the rendering of, or failure to render, **professional services** to any one person by an **insured** or any person for whose acts or omissions an **insured** is legally responsible, which results, or is likely to result, in a claim for **damages**; or

    B.    a single act or omission or a series of related acts or omissions by an **insured professional** during the performance of **peer review services** which results, or is likely to result, in a claim for **damages**.

For purposes of this definition, treatment of mother and fetus (or fetuses) from conception through postpartum care constitutes a single **professional incident**. In no event shall separate, discrete events or injuries that occur during a single medical or dental procedure or continuing course of related treatments constitute more than one **professional incident**. In all cases involving a series of related acts or omissions during a continuing course of **professional services**, the **professional incident** shall be deemed to have occurred at the time of the earliest act or omission comprising that **professional incident**, even if it began before the **retroactive date**.

**Professional services** means the provision of medical or dental services to a patient of an **insured**, including treatment, making diagnoses and rendering opinions or advice, in accordance with any and all required licenses for the provision of such services.

**Report**, **reported**, and **reporting** mean, when used with respect to a **professional incident**, the giving by an **insured** or his or her representative of notice of the **professional incident** either in writing or by telephone to **our** Claims Department specifying (1) the date, time, and place of the **professional incident**, (2) a description of the **professional incident**, (3) the name, address, and age of the patient or claimant, (4) the names of witnesses, including other treating physicians, and (5) the circumstances resulting in the **professional incident**. A **professional incident** shall be deemed **reported** on the date the **report** is actually received by **our** Claims Department. A **professional incident** that is not the subject of an **assertion of liability** must be reported within 30 days of the date on which the **professional incident** occurred; after the expiration of this 30-day period the **professional incident** cannot be **reported** to trigger coverage unless the **insured** has received an **assertion of liability**.

**Reporting Endorsement** (or "Tail Coverage") means an endorsement issued with respect to an **insured** under Section VI, VII or VIII of the Professional Liability Coverage Part to provide coverage for **professional incidents** first **reported** on or after the date of termination of the insurance provided by this **policy** to the **insured**.

**Retroactive date** means the date identified as such on the **Coverage Summary** with respect to each **insured**.

**We**, **our** and **us** refer to the company that issued this **policy** and is designated as "THE COMPANY" on the **Cover Page**.

# PROFESSIONAL LIABILITY COVERAGE PART

I.    **INSURING AGREEMENT**

    Subject to the applicable limit of liability, **we** agree to pay on behalf of each **insured** all sums (in excess of any applicable deductible) that the **insured** shall become legally obligated to pay as **damages** because of any **professional incident** that (1) occurs on or after the **retroactive date** applicable to the **insured** and (2) is first **reported** during the **policy period**; provided, however, that **insured paramedical employees** and **other covered employees** are covered only for **professional incidents** that occur while such persons are employed by an **insured organization** or **insured professional** and acting within the scope of their employment and while engaged in the performance of **professional services** that they hold any required license to perform. **Other covered employees** have no coverage separate or apart from their employer, and **damages** paid on behalf of an **other covered employee** are subject to the employer's coverage limit. The coverage provided to an **insured professional** or an **insured paramedical employee** shall also cover one or more properly licensed individuals who serve in the capacity of a temporary substitute in place of the **insured professional** or **insured paramedical**

**employee** for not more than forty-five (45) days during the **policy period**; provided that any individual who serves in such capacity in place of multiple **insured professionals** or multiple **insured paramedical employees** shall be covered for no more than a total of ninety (90) days during the **policy period**.  This insurance applies to **professional incidents** arising out of **professional services** or **peer review services** rendered anywhere in the world, provided that any resulting claim or suit is prosecuted within the United States of America, its possessions or territories.  This insurance does not apply to any claim or suit asserted, filed, pursued, or prosecuted in or pursuant to the authority of any court, tribunal, or other  governmental or legal authority outside the jurisdiction of the United States of America, its possessions and territories.

## II.    INVESTIGATION, DEFENSE AND SETTLEMENT

**We** have the right to investigate any **professional incident** that **we** deem expedient.  **We** have the right and duty to defend any suit against an **insured** seeking **damages** that, if awarded, would be covered by this **policy**, even if any of the allegations of the suit are groundless, false or fraudulent, and **we** have the right, but not the duty, to defend any claim against an **insured** seeking such **damages**.  **We** have the right to select defense counsel in any claim or suit defended by **us**.  **We** will not pay fees and expenses of any legal counsel not retained by **us**.  If a claim or suit is asserted against more than one **insured**, **we** may retain the same legal counsel to defend all **insureds**, consistent with counsel's ethical duties to avoid conflicts of interest.

**We** have the right to settle any claim or suit against an **insured** seeking **damages** that, if awarded, would be covered by this **policy**; provided that no settlement will be made without the written consent of the **policyholder** unless (a) the **policyholder** cannot be located and contacted after reasonable efforts are made by **us**; or (b) the settlement is made after a verdict or judgment has been rendered against an **insured**.

**We** have the right to take an appeal from any judgment against an **insured** in **our** sole discretion, but **we** shall not be obligated to do so.

**We** shall not be obligated to pay **damages** or to defend any suit after the applicable limit of liability has been exhausted.

## III.   EXCLUSIONS

**We** will not pay **damages** because of any of the following, and **we** have no obligation to provide a defense for any claim or suit alleging any of the following:

A.     Liability of an **insured** as an owner, superintendent, administrator, director, trustee, officer, or medical director of any hospital, sanitarium, clinic with bed and board facilities, nursing home, ambulatory surgery center, laboratory, health maintenance organization, preferred provider organization, exclusive provider organization, other healthcare entity, or other business enterprise, unless the **insured** directly participates in the rendering of or failure to render **professional services** giving rise to the alleged liability;

B.     Liability assumed by an **insured** under any contract or agreement, whether oral, written or implied, except that this exclusion does not apply to liability that would be imposed on the **insured** by law in the absence of the contract or agreement;

C.     Liability arising out of any fraudulent, criminal, malicious, or intentionally wrongful act or omission, including but not limited to liability arising in whole or in part out of sexual activity, or acts in furtherance of sexual activity, whether under the guise of **professional services** or not; provided, however, that **we** will defend (up to a maximum of $100,000 in costs, expenses, and  attorney fees for all such claims first **reported** during the **policy period**) any claims alleging liability excluded by this paragraph until such time as the **insured** is adjudicated to have committed, or pleads guilty to, an act or omission described in this paragraph;

D.     Injury to any employee of an **insured** unless arising from the treatment of the employee as a patient of the **insured**; including but not limited to any obligation for which an **insured** or any carrier as insurer may be held liable under any workers' compensation, unemployment compensation, disability benefits, or any similar law;

E.     Liability arising out of any antitrust violation (except for antitrust violations arising from **peer review services** for which coverage is otherwise afforded), unfair competition, discrimination, violation or denial of civil rights, breach of electronic data security, violation of the federal Anti-Kickback statute, liability under the Federal False Claims Act or the Patient Protection and Affordable Care Act, or any other act or omission which violates any statute, ordinance or regulation imposing any fine, penalty or other sanction, including but not limited to attorney fees or multiples of compensatory damages such as double or treble damages;

F.     Any **professional incident** that has been **reported** to another insurance carrier prior to the **continuous coverage effective date**; any **professional incident** that occurred prior to the **continuous coverage effective date**, if on that date, the **insured** knew or believed, or had reason to know or believe, that the

**professional incident** might reasonably be result in a claim for **damages**; or any **professional incident** that occurred during a period in which the **insured** was not covered by a policy of professional liability insurance;

G.      Liability for any alleged errors, omissions, or improprieties by the **insured** in billing statements for **professional services** rendered to a patient, including but not limited to any claim for cancellation or refund of fees billed or paid for **professional services**;

H.      Liability of any **insured** for any act or omission for which the United States government is responsible under the provisions of the Public Health Service Act, 42 U.S.C. 233, or the Federal Tort Claims Act, 28 U.S.C. 1346(b), 2671-2680, or both, and any amendments thereto.

## IV.     LIMITS OF LIABILITY AND DEDUCTIBLES

The limits of liability specified in the **Coverage Summary** for each **insured professional** shall apply to all claims or suits made or brought against that **insured professional**, except for claims or suits against an **insured professional** based upon the rendering of or failure to render **professional services** by someone other than the **insured professional** and for whose acts or omissions the **insured professional** is liable solely by reason of his or her status as a member, partner, officer, director or shareholder of an **insured organization**, in which case the limits of liability specified in the **Coverage Summary** for the **insured organization** shall apply as described below.

The limits of liability specified in the **Coverage Summary** as applicable to each **insured paramedical employee** shall apply to all claims or suits made or brought against the **insured paramedical employee**.

The limits of liability specified in the **Coverage Summary** as applicable to an **insured organization** shall apply to all claims or suits made or brought against (1) the **insured organization**; (2) any **other covered employee**; and (3) any **insured professional** if the alleged liability arises out of the rendering of, or failure to render, **professional services** by someone other than the **insured professional** and for whose acts or omissions the **insured professional** is liable solely by reason of his or her status as a member, partner, officer, director or shareholder of the **insured organization**.

The limit of liability specified in the **Coverage Summary** for each **insured** as "each professional incident" is the total of **our** liability to the **insured** resulting from any one **professional incident**. The limit of liability specified in the **Coverage Summary** for each **insured** as "annual aggregate" is the total limit of **our** liability to that **insured** resulting from all **professional incidents** that are first **reported** during the **policy period**.

The limit of liability shall apply regardless of:

A.      the number of claimants seeking **damages** covered by this **policy**;

B.      the number of claims or suits brought on account of a **professional incident**;

C.      the number of **insureds** under this **policy**; or

D.      the inclusion of an additional insured.

If Additional Limits of Liability are shown in the **Coverage Summary** for any **insured**, the additional coverage so depicted shall apply only to (1) **professional incidents** that occur on or after the Additional Coverage Retroactive Date shown for that **insured** in the **Coverage Summary** and (2) after exhaustion of the Primary Limits of Liability applicable to that **insured**.

**We** shall have the right to allocate **damages** or supplementary payments among claimants, **insureds**, and policies as **we** deem expedient

If a **Reporting Endorsement** is issued, **our** liability for all **professional incidents** first **reported** after the effective date of the **Reporting Endorsement** shall be as stated therein.

If a "Deductible" is shown for any **insured** in the **Coverage Summary** as applicable to this Coverage Part, the **insured** shall be liable for **damages** arising from each **professional incident reported** in an amount equal to the Deductible shown in the **Coverage Summary**, and **our** limit of liability will be reduced by that amount. The **insured** shall retain liability to third parties for the amount of any deductible, and **we** will only pay that portion of the **damages** that exceeds the amount of the deductible. In the event **we** pay on behalf of an **insured** all or part of the deductible, the **policyholder** shall reimburse **us** for the amount of the payment within thirty (30) days after written demand. The **policyholder** agrees to pay all costs, including attorneys' fees and court costs, incurred by **us** in collecting any reimbursement.

## V.     SUPPLEMENTARY PAYMENTS

**We** will pay, in addition to the applicable limit of liability:

A.      all expenses incurred by **us**, all costs taxed against an **insured** in any suit defended by **us**, and interest

accruing on a judgment or award against an **insured** before **we** have paid, tendered, or deposited in court that part of the judgment which does not exceed the limit of **our** liability thereon; provided that (1) **we** reserve the right to seek reimbursement from the **insured** for the costs and expenses **we** incur in defending any claim that is not covered by the **policy**; and (2) **we** will pay interest only on that portion of the judgment or award that does not exceed the applicable limit of liability;

B.   commercially reasonable premiums on (1) appeal bonds in any suit defended by **us** and (2) bonds to release attachments in any such suit; provided in either case that (a) there is no dispute with respect to the coverage available under the **policy** for the claims asserted in the suit; (b) the amount of the bond shall not exceed the applicable limit of liability of this **policy**; and (c) **we** shall have no obligation to apply for or furnish any bond; and

C.   reasonable travel and lodging expenses incurred by an **insured professional**, previously approved by **us**, plus up to $500 per day to compensate loss of time for each day that the **insured professional** is required to attend the trial of a matter covered by this **policy.**

## VI.   REPORTING ENDORSEMENT PROVISION APPLICABLE TO INSURED PROFESSIONALS

If the insurance afforded by this **policy** to an **insured professional** terminates, either by nonrenewal or cancellation, the **insured professional** shall have the right, upon the payment of an additional premium (to be computed in accordance with **our** rules, rates, rating plan and premiums applicable on the effective date of the endorsement), to have issued a policy and a **Reporting Endorsement**, in the form then used by **us**, providing coverage for **professional incidents** occurring prior to the termination date and for which the **insured professional** is otherwise covered by this **policy**, but which are first **reported** after the termination date. This right must be exercised by an **insured professional** by making payment to **us** not later than thirty (30) days after the termination date.

Notwithstanding the foregoing, a **Reporting Endorsement** shall be issued in accordance with **our** rules on the effective date of the endorsement to an **insured professional** automatically and without payment of any additional premium in case the termination of insurance results from:

A.   the death of the **insured professional**;

B.   the **insured professional's** attainment of age 65, but only if the **insured professional** shall have been insured continuously by **us** for the immediately preceding ten (10) years;

C.   the **permanent and total retirement** of the **insured professional**, but only if the **insured professional** shall have been insured continuously by **us** for the immediately preceding five years. The **insured professional** must submit an affidavit satisfactory to **us** in which the **insured professional** confirms an intention to permanently and totally retire from the practice of medicine or dentistry and agrees to pay a premium for the **Reporting Endorsement** if the **insured professional** recommences the practice of medicine or dentistry within five years after delivering the affidavit;

D.   the permanent and total disability of the **insured professional** resulting in complete and total inability to practice medicine or dentistry, but only if the permanent and total disability:

1.   shall have continued without significant interruption for a term of not less than six months prior to termination; and

2.   shall have required regular treatment by a legally qualified medical or surgical practitioner other than the **insured professional**.

The foregoing provisions governing the issuance of a **Reporting Endorsement** at no premium charge in the event of items A through D above shall not alter, amend, modify, supersede, or in any way change the conditions and requirements for cancellation or non-renewal of the **policy** as provided by applicable law and otherwise described herein.  Following the cancellation or non-renewal of the **policy** in conformity with applicable law, if none of the conditions described in items A through D above are then satisfied, no **insured professional** shall have any right or expectancy to receive either (1) a **Reporting Endorsement** at no additional premium charge or (2) a refund of any premium previously paid by the **insured professional**

**The Reporting Endorsement** issued to an **insured professional** pursuant to this Section shall provide coverage only for the **insured professional**. The **Reporting Endorsement** shall not provide coverage to any **insured organization** or **insured paramedical employee**. **Insured organizations** and **insured paramedical employees** must obtain individual **Reporting Endorsements** as provided in Sections VII and VIII below.

## VII.   REPORTING ENDORSEMENT PROVISION APPLICABLE TO INSURED PARAMEDICAL EMPLOYEES

If the insurance afforded by this **policy** to an **insured paramedical employee** terminates, either by nonrenewal or

cancellation, the **insured paramedical employee** shall have the right, upon the payment of an additional premium (to be computed in accordance with **our** rules, rates, rating plan and premiums applicable on the effective date of the endorsement), to have issued a policy and a **Reporting Endorsement**, in the form then used by **us** for individual coverage, providing coverage for **professional incidents** occurring prior to the termination date and for which the **insured paramedical employee** is otherwise covered by this **policy**, but which are first **reported** after the termination date.  This right must be exercised by an **insured paramedical employee** by making payment to **us** not later than thirty (30) days after the termination date.

The **Reporting Endorsement** issued to an **insured paramedical employee** pursuant to this Section shall provide coverage only for the **insured paramedical employee**. The **Reporting Endorsement** shall not provide coverage to any **insured professional** or **insured organization**. **Insured professionals** and **insured organizations** must obtain individual **Reporting Endorsements** as provided in Sections VI and VIII herein.

Notwithstanding the foregoing, an **insured paramedical employee** who shares coverage with one or more other **insureds** (a "Sharing Paramedical Employee") shall have no right or ability to purchase a separate **Reporting Endorsement**.  If a Sharing Paramedical Employee's coverage terminates, the Sharing Paramedical Employee shall continue to share any coverage (under an active policy or a Reporting Endorsement) applicable and available to the other **insureds** with whom the Sharing Paramedical Employee previously shared coverage, provided that the **professional incident** (1) occurred on or after the **retroactive date** applicable to the Sharing Paramedical Employee; (2) occurred before the termination of the Sharing Paramedical Employee's active coverage under the **policy**; (3) is first **reported** within a period of active coverage for an **insured** with whom the Sharing Paramedical Employee shared coverage; and (4) otherwise satisfies all terms and conditions of the active coverage available to the other **insured** whose coverage will be shared.

**VIII.   REPORTING ENDORSEMENT PROVISION APPLICABLE TO INSURED ORGANIZATIONS**

In the event of termination of the insurance afforded by this **policy**, either by nonrenewal or cancellation, an **insured organization** shall have the right, upon the payment of an additional premium (to be computed in accordance with **our** rules, rates, rating plan and premiums applicable on the effective date of the endorsement), to have issued a **Reporting Endorsement** providing coverage for **professional incidents** occurring prior to the termination date and otherwise covered by this **policy**, but which are first **reported** after the termination date; provided that this right is contingent upon the purchase of a **Reporting Endorsement** by all **insured professionals** affiliated with the **insured organization**. This right must be exercised by the **insured organization** by making payment to **us** not later than thirty (30) days after the termination date.

The **Reporting Endorsement** issued to an **insured organization** pursuant to this Section shall provide coverage only for the **insured organization**. The **Reporting Endorsement** shall not provide coverage to any **insured professional** or **insured paramedical employee**. **Insured professionals** and **insured paramedical employees** must obtain individual **Reporting Endorsements** as provided in Sections VI and VII above.

Notwithstanding the foregoing, an **insured organization** that shares coverage with one or more other **insureds** (a "Sharing Organization") shall have no right or ability to purchase a separate **Reporting Endorsement**.  If a Sharing Organization's coverage terminates, the Sharing Organization shall continue to share any coverage (under an active policy or a Reporting Endorsement) applicable and available to the other **insureds** with whom the Sharing Organization previously shared coverage, provided that the **professional incident** (1) occurred on or after the **retroactive date** applicable to the Sharing Organization; (2) occurred before the termination of the Sharing Organization's active coverage under the **policy**; (3) is first **reported** within a period of active coverage for an **insured** with whom the Sharing Organization shared coverage; and (4) otherwise satisfies all terms and conditions of the active coverage available to the other  **insured** whose coverage will be shared.

# GENERAL CONDITIONS

**I.   PREMIUM**

All premiums shall be computed in accordance with **our** rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

**II.   RIGHTS AND DUTIES OF POLICYHOLDER**

Unless named as an **insured** in the **Coverage Summary**, the **policyholder** is not an **insured** and shall have no coverage under this **policy**. However, the **policyholder** shall pay all premiums, receive all return premiums, provide any consents, including consent to settle, as may be required, and receive all notices and invoices under

this **policy**. All provisions in the General Conditions that are applicable to the **insureds** shall also apply to the **policyholder**.

## III.   INSPECTION

**We** shall be permitted but not obligated to inspect any **insured**'s property and operations at any time. Neither **our** right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of any **insured** or others, to determine or warrant that the **insured's** property or operations are safe, healthful, or in compliance with any law, rule or regulation.

## IV.   INSUREDS' DUTIES

A.   If an **insured** wishes to **report** a **professional incident** that is not the subject of an **assertion of liability**, the **insured** must **report** the **professional incident** to us within 30 days of the date on which the **professional incident** occurs.  **We** will not provide coverage for any **professional incident reported** more than 30 days after the **professional incident** occurs unless the **insured** receives an **assertion of liability** with respect to the **professional incident** and provides a description of an oral **assertion of liability** or a copy of a written **assertion of liability** to **us** within the **policy period** or any applicable extended reporting period, in which case the **professional incident** will be deemed **reported** as of the date on which **our** Claims Department receives the oral description or written copy of the  **assertion of liability**.

B.   If any **insured** receives an **assertion of liability**, the **insured** shall immediately (1) **report** the **professional incident** that is the subject of the **assertion of liability** and (2) forward to **us** a copy of any written **assertion of liability**, including any demand, notice, summons or other process received by the **insured** or any representative of the **insured**.

C.   Each **insured** shall cooperate with **us** and with legal counsel retained by **us** to defend any insured claim and shall, upon **our** request, assist in the conduct of suits, in the settlement of suits and claims, and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **insured** because of injury with respect to which insurance is afforded under this **policy**, and the **insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. No **insured** shall, without **our** prior approval, make any payment or assume any obligation with respect to a **professional incident**, except at the **insured's** own expense.  Each **insured** shall be honest and truthful with patients, consistent with paragraph D below, but no **insured** shall admit liability for a **professional incident** prior to consulting with **us** or legal counsel retained by **us** to represent the **insured**.

D.   No **insured** shall alter, make any improper amendment to, destroy, or dispose of patient records or misrepresent or conceal facts pertinent to any incident, claim or suit.

E.   Each **insured** shall notify **us** in writing, within thirty (30) days after the occurrence of any one or more of the following:

   1.   The **insured** receives a reprimand or complaint or undergoes treatment, or is advised by a physician, peer review committee, hospital credentialling committee or licensing agency to undergo treatment related to alcohol, drug or other substance abuse, sexual misconduct, or for psychiatric illness;

   2.   The **insured** suffers an illness or physical defect which impairs, or is likely to impair, the **insured's** ability to practice for a period of thirty (30) days or more;

   3.   The **insured** is convicted of, or pleads guilty or no contest to, any felony or misdemeanor other than minor traffic offenses;

   4.   The **insured's** license to practice medicine or dentistry, or to dispense medicine, or otherwise to deliver healthcare services of any type, is revoked, suspended, surrendered or limited in any respect, or the **insured** is called to appear before any  licensing agency, peer review committee, professional standards review committee or credentialling committee in a proceeding seeking to terminate, revoke or limit the **insured's** employment or privilege to practice; or

   5.   The **insured's** privilege to practice is terminated, revoked or limited by the **policyholder**, any hospital or other employer, whether by reason of termination of employment or otherwise.

If any **insured** fails to comply with any duties or obligations described in this Section IV, or otherwise breaches any term or condition of the **policy**, **our** obligations to the **insured** under the **policy** shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

## V.   CLAIMS AGAINST US

No claim shall lie against **us** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this **policy**, nor until the amount of any **insured**'s obligation to pay **damages** shall have been

finally determined either by judgment against an **insured** after actual trial or by written agreement of the **insured**, the claimant, and **us**. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this **policy** to the extent of the insurance afforded by this **policy**. No person or organization shall have any right under this **policy** to join **us** as a party to any action against an **insured** to determine the **insured**'s liability, nor shall **we** be impleaded by an **insured** or any legal representative.

**Our** liability in any cause of action based on allegations that **we** did not fulfill **our** obligations to any **insured** in good faith shall not exceed the value of the **insured's** assets that are legally subject to attachment and levy by a judgment creditor after payment of all sums available through this **policy**. For purposes of this limitation, the "value of the **insured's** assets" shall be determined as of the date of the judgment rendered against the **insured** and shall not include the subject cause of action against **us**.

Bankruptcy or insolvency of any **insured** or any **insured's** estate shall not relieve **us** of any of **our** obligations hereunder.

Any claim against **us**, including without limitation any cause of action that relates to or arises in connection with this **policy**, or that is based on allegations that **we** did not fulfill **our** obligations to any **insured** in good faith, shall be brought in arbitration pursuant to Section XIII below.

## VI.   OTHER INSURANCE

A.   Except as provided in B or C below, or in any endorsement forming a part of this **policy**, this insurance is primary.

B.   With respect to loss arising from **peer review services** (other than **peer review services** performed on **our** behalf), the insurance provided by this **policy** is excess over any **other insurance**.

C.   Insurance provided to any **insured** by "Additional Limits of Liability," as specified in the **Coverage Summary**, shall apply only after exhaustion of the "Primary Limits of Liability" specified in the **Coverage Summary** for the **insured**. Insurance provided by Additional Limits of Liability shall be in excess of, and shall not contribute with, any **other insurance**. If Additional Limits of Liability are provided, **we** shall, after the Primary Limits of Liability have been exhausted, have no duty to defend any suit that any other insurer has a duty to defend.

D.   When both this insurance and **other insurance** apply to loss on the same basis, whether primary, excess or contingent, **we** shall not be liable under this **policy** for a greater proportion of the loss than that stated in the applicable contribution provision below:

1.   If all **other insurance** provides for contribution by equal shares, **we** shall not be liable for a greater proportion of the loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of loss is paid, and with respect to any amount of loss not so paid, the remaining insurers then continue to contribute in equal shares of the remaining amount of the loss until each insurer has paid its limit in full or the full amount of the loss is paid.

2.   If any **other insurance** does not provide for contribution by equal shares, **we** shall not be liable for a greater proportion of the loss than the applicable limit of liability under this **policy** for the loss bears to the total applicable limit of liability of all valid and collectible insurance against the loss.

## VII.   SUBROGATION

In the event of any payment under this **policy**, **we** shall be subrogated to any **insured**'s rights of recovery against any person or organization, and the **insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure **our** subrogation rights. No **insured** shall do anything to prejudice **our** rights.

## VIII.   ASSIGNMENT

No **insured** may assign any interest in this **policy**. If, however, any **insured** shall die, the insurance provided by this **policy** shall apply to the **insured**'s legal representative, as an **insured**, but only while acting within the scope of the representative's duties. No **insured** shall assign any cause of action against **us** that relates to or arises in connection with this **policy**, or that is based on allegations that **we** did not fulfill **our** obligations to any **insured** in good faith.

## IX.   CHANGES

The terms of this **policy** can only be changed by endorsement issued by **us** to form a part of this **policy**.

**X.    CANCELLATION**

This **policy**, or coverage of any **insured** thereunder, may be canceled by the **policyholder** by mailing to **us** written notice stating when thereafter the cancellation shall be effective. This **policy**, or coverage of any **insured** thereunder, may be canceled by **us** by mailing to the **policyholder**, at the address shown in the **Coverage Summary**, written notice stating when the cancellation shall be effective, in accordance with applicable state law. The effective date and hour of cancellation stated in the notice shall become the end of the **policy period** for each **insured** to which the cancellation applies. Delivery of written notice either by the **policyholder** or by **us** shall be equivalent to mailing. If the **policyholder** cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If **we** cancel, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**XI.    RENEWAL OF POLICY**

Neither the **policyholder** nor **we** have any obligation to renew this **policy**. Any renewal will be on the policy forms and endorsements then in effect. If **we** elect not to renew this **policy**, or coverage of any **insured** thereunder, **we** will provide notice of nonrenewal in accordance with applicable state law.

**XII.    FRAUD AND MISREPRESENTATIONS**

By acceptance of this **policy**, the **policyholder** and all **insureds** agree that the statements in the **Coverage Summary**, in their respective applications or renewal applications for insurance, and in any other material submitted to **us** in order to secure insurance coverage, are their agreements and representations, that this **policy** is issued in reliance upon the truth of such representations, and that this **policy** embodies all agreements existing between themselves and **us** or any of **our** agents relating to this insurance. In the event of any fraud, material misrepresentation or omission by any **insured** in any application, renewal application, or other material submitted to **us** to obtain insurance, this **policy** is void as to that **insured**, no coverage is afforded to that **insured**, and that **insured** shall have no right to purchase a **Reporting Endorsement**.

**XIII.    ARBITRATION**

**PLEASE READ THIS ARBITRATION PROVISION CAREFULLY.   IT PROVIDES THAT EITHER THE INSUREDS OR WE CAN REQUIRE THAT ANY CONTROVERSY OR DISPUTE, AS IDENTIFIED IN GREATER DETAIL BELOW, BE RESOLVED BY BINDING ARBITRATION (EXCEPT FOR MATTERS THAT ARE EXCLUDED FROM ARBITRATION AS SPECIFIED BELOW).   ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDINGS.**

Both the **insureds** and **we** acknowledge that this agreement evidences a transaction involving interstate commerce. Any dispute, claim or controversy arising out of, relating to or in connection with this **policy**, its subject matter or its negotiation, as to the existence, validity, interpretation, performance, non-performance, enforcement, operation, breach of contract, breach of warranty, continuance or termination thereof, including but not limited to any claim alleging a violation of any federal or state statute, any claim having its foundation in federal or state common law, and claims alleging fraud, deceit, or suppression of any material fact or breach of fiduciary duty shall be submitted to binding arbitration in accordance with Title 9 U.S.C. § 1 et seq. (the Federal Arbitration Act) and the Commercial Arbitration Rules of the American Arbitration Association. The arbitration proceedings may be initiated by either party by notice in writing to the other and to the American Arbitration Association. Each party to arbitration shall bear its own arbitration costs and expenses. However, in the event any party is required to file a petition or commence any other proceeding to compel arbitration, the arbitrator may award that party reasonable attorney's fees and costs incurred in having to bring such action. The arbitrator shall have the discretion to order a pre-hearing exchange of information by the parties, including, without limitation, production of requested documents, exchanging of summaries of testimony of proposed witnesses, and examination by deposition of parties. Notwithstanding contrary state law or regulation, the arbitrator shall have the authority to award any remedy or relief allowed under the provisions of the Federal Arbitration Act, including, without limitation, specific performance of any obligation created under this **policy**, the awarding of any damages available under applicable law, the issuance of an injunction, or the imposition of sanctions for abuse or frustration of the arbitration process. Any arbitration award shall be in writing and shall specify the factual and legal bases of the award. Judgment on the award rendered by the arbitrator shall be final and may be entered in any court having jurisdiction thereof.

The provisions hereof shall be a complete defense to any suit, action, or proceeding in any federal, state or local court or before any administrative tribunal with respect to any dispute, claim or controversy arising under this **policy**.   Moreover, **we** and each **insured** expressly waive any right to a jury trial on any and all of the claims covered by this arbitration provision.

Healthcare Professional Liability Policy
Claims-Made Form
©2012 ProAssurance Corporation

No **insured** shall be able to bring a class action or other representative action in any court, nor will any **insured** be able to bring any claim in arbitration as a class action or other representative action.  No **insured** will be able to take part in any class action or other representative action brought by anyone else or be represented in a class action or other representative action.  Neither **we** nor the **insureds** agree or consent to any arbitration on a class or representative basis, and the arbitrator shall have no authority to proceed on such basis.  This means that even if a class action lawsuit or other representative action is filed, any claim between any **insured** and **us** related to the issues raised in such lawsuits will be subject to resolution only by an individual arbitration claim.

If **we** maintain an office in the state in which the address of the **policyholder** (as specified in the **Coverage Summary**) is located, the arbitration shall proceed in any county in which **we** maintain an office in that state.  If **we** do not maintain an office in the state in which the address of the **policyholder** (as specified in the **Coverage Summary**) is located, the arbitration shall proceed in the county that includes the capital of the state in which the address of the **policyholder** (as specified in the **Coverage Summary**) is located.

If any portion of this arbitration provision is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force.

**XIV.   GOVERNING LAW**

This **policy** shall be construed, and the legal relations between **us** and the **insureds** (and anyone claiming any interest in or rights under the **policy**) shall be determined, in accordance with the laws of the state in which the address of the **policyholder**, as specified in the **Coverage Summary**, is located, except that the Federal Arbitration Act (Title 9 of the United States Code) shall apply to the rights and obligations of the parties to submit any dispute, claim or controversy arising under this **policy** to arbitration, as provided in Section XIII above.

**XV.   HEADINGS**

The section headings contained herein are for convenience of reference only and are not intended to define, limit or describe the scope or intent of any provision in the **policy**.

Healthcare Professional Liability Policy
Claims-Made Form
©2012 ProAssurance Corporation

# HEALTHCARE PROFESSIONAL LIABILITY POLICY
# LEGAL EXPENSE COVERAGE PART

**LEGAL EXPENSE COVERAGE LIMIT (EACH COVERED INSURED PER POLICY PERIOD): $5,000**

## I.   DEFINITIONS

Terms appearing in **bold face print** shall have the meanings given in the Definitions section of the **policy**. In addition:

**Appointed counsel** means the attorney or firm of attorneys that, in **our** sole discretion, is either (1) appointed by **us** in writing, or (2) appointed by a **covered insured** with **our** prior written approval, to defend a **covered insured** in any **covered investigation**.

**Covered insured** means any **insured professional**, **insured paramedical employee,** or any **insured organization**.

**Covered investigation** means any one or more of the following:

A.   A subpoena or request received by the **covered insured**, requiring the **covered insured** to testify in a trial or deposition, or to provide other discovery, other than as an expert witness, in connection with a legal proceeding (1) arising out of a **professional incident**, but (2) in which the **covered insured** is not a party.

B.   A disciplinary proceeding initiated by a licensure commission, board of ethics or similar professional body, which accuses a **covered insured** of, or investigates an accusation that a **covered insured** engaged in, improper or unprofessional conduct in the course of such **covered insured's** medical practice.

C.   An investigation or proceeding commenced by the governmental or regulatory agency charged with determining whether the **covered insured** participated in the improper transfer of a patient ("dumping"), in violation of the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended ("COBRA /EMTALA").

D.   An investigation or proceeding commenced by a **utilization and quality control peer review organization**, but only at the level of such investigation or proceeding in which sanctions may be imposed on the **covered insured.**

E.   An investigation or proceeding commenced by the governmental or regulatory agency charged with the enforcement of compliance with regulations pertaining to the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), whether or not the **covered insured** was in violation of such regulations.

F.   An investigation or proceeding commenced by the governmental or regulatory agency charged with the enforcement of compliance with regulations pertaining to the Omnibus Budget Reconciliation Act of 1990 ("OBRA '90") including all OBRA Acts updating OBRA '90, whether or not the **covered insured** was in violation of such regulations.

G.   An investigation or proceeding commenced by the governmental or regulatory agency charged with the enforcement of compliance with the Occupational Safety and Health Administration ("OSHA") regulations pertaining to bloodborne pathogens, whether or not the **covered insured** was in violation of such regulations.

H.   A claim or investigation instituted by a patient of the **covered insured** alleging errors or omissions by the **covered insured** in billing statements for **professional services** rendered to such patient.

I.   An investigation or proceeding commenced by a hospital or its medical staff for the purpose of revocation, non-renewal, termination, suspension, modification or restriction of an insured's staff privileges or for the purpose of peer review or credentialing.

J.   A proceeding alleging violation of the federal Anti-Kickback statute or liability under the Federal False Claims Act or the Patient Protection and Affordable Care Act."

**Criminal prosecution** means any governmental action seeking enforcement of criminal laws, including offenses for which conviction could result in imprisonment.

**Legal expenses** means the normal, reasonable and customary charges of the **appointed counsel** in defending a **covered insured** in any **covered investigation**, including reasonable out-of-pocket charges incurred by such **appointed counsel**. **Legal expenses** does not include damages, fines, judgments or penalties that may be assessed in any **covered investigation** or paid in any settlement thereof, or expenses incurred in the defense of any **criminal prosecution**.

**Utilization and quality control peer review organization** means a utilization and quality control peer review organization under contract with the U. S. Department of Health and Human Services to review the professional activities of physicians and other health care practitioners and providers under the federal Social Security Act, as amended, while acting within the scope of its duties under such contract.

## II.  INSURING AGREEMENT

**We** will pay on behalf of any **covered insured** the **legal expenses** incurred by such **covered insured** in the course of a **covered investigation**, provided that:

A.  the incident giving rise to the **covered investigation** occurs on or after the **continuous coverage effective date** applicable to such **covered insured** and prior to the termination of the **policy;**

B.  the **covered insured** first receives written notice of the commencement of the **covered investigation** within the **policy period**; and

C.  the **covered investigation** is first reported to **us** during the **policy period**.

We will pay **legal expenses** contemplated herein (1) directly to **appointed counsel** if **we** elect to appoint such counsel or (2) to the **covered insured** upon presentation of **appointed counsel's** invoices and evidence of payment by the **covered insured** if **we** elect to reimburse costs of **appointed counsel** selected by the **covered insured**.

## III.  LIMIT OF LIABILITY

The Legal Expense Coverage Limit stated above is the total of **our** liability to each **covered insured** for all **covered investigations** to which this Coverage Part applies.

All **covered investigations** arising out of the same underlying facts or events, whenever and wherever initiated, are deemed to be one **covered investigation**, even if related **covered investigations** comprising such single **covered investigation** were made in more than one **Policy Period**.

## IV.  NO REPORTING ENDORSEMENT AVAILABLE

No **Reporting Endorsement** is available for the coverage provided in this Legal Expense Coverage Part.  The coverage provided herein shall terminate at the end of the **policy period**.  If this endorsement is attached to a policy providing Health Care Professional Liability coverage on an occurrence basis, no coverage is provided hereunder for any **covered investigation** that begins after the **policy period** ends.

# HEALTHCARE PROFESSIONAL LIABILITY POLICY CYBERASSURANCE ENDORSEMENT

THIS ENDORSEMENT FORMS A PART OF THE **POLICY** REFERENCED BELOW, AND TAKES EFFECT ON THE EFFECTIVE DATE AND HOUR OF SAID **POLICY** UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW, AND EXPIRES CONCURRENTLY WITH SAID **POLICY**.

**POLICYHOLDER: River Valley Forensic Services PA**

**ENDORSEMENT EFFECTIVE DATE: 1/1/2022**

**POLICY NUMBER: MP116894**

### NOTICE TO POLICYHOLDER

This Endorsement amends the **policy** to include CyberAssurance coverage.  Read the entire Endorsement carefully to determine the rights and duties of the **insured** and what is and is not covered.

Section IV - Limits of Insurance specifies the limits for the coverages provided under this Endorsement.  Such limits are in addition to and do not erode the limits shown on the **Coverage Summary**. **Defense costs** paid under this Endorsement will erode the limits of liability set forth in Section IV - Limits of Insurance of this Endorsement.

Words and phrases that appear in bold have special meaning.  Refer to Section V - Definitions of this Endorsement.

In consideration of payment of the additional premium due, if any, and in reliance upon the representations of the **insured**, **we** and the **insured** agree to amend the **policy** by adding the coverage as specified below:

## SECTION I - COVERAGES AND EXCLUSIONS

### A.    Insuring Agreements

1.    Coverage A - Multimedia Liability:  **We** agree to pay all amounts within the applicable limit of insurance set forth in Section IV - Limits of Insurance, which the **insured** becomes legally obligated to pay as **loss**, including liability **assumed under contract**, and related **defense costs**, because of a **claim** for a **multimedia peril**, provided that:

   a.    Such **claim** is first made against the **insured** during the **policy period**;
   b.    Such **claim** is reported to **us** during the **policy period**; and
   c.    The **multimedia peril** occurs or first commences on or after the **retroactive date**.

2.    Coverage B - Security and Privacy Liability:  **We** agree to pay all amounts within the applicable limit of insurance set forth in Section IV - Limits of Insurance, which the **insured** becomes legally obligated to pay as **loss**, and related **defense costs**, because of a **claim** for a **security and privacy wrongful act** that directly results from a **security breach** or **privacy breach**, provided that:

   a.    Such **claim** is first made against the **insured** during the **policy period**;
   b.    Such **claim** is reported to **us** during the **policy period**; and
   c.    The **security breach** or **privacy breach** and the resulting **security and privacy wrongful act** occur or first commence on or after the **retroactive date**.

3.    Coverage C - Privacy Regulatory Defense and Penalties:  **We** agree to pay all amounts within the applicable limit of insurance set forth in Section IV - Limits of Insurance, which the **insured** becomes legally obligated to pay as **regulatory fines and penalties** and/or a **regulatory compensatory award**, and related **defense costs**, because of a **claim** resulting from a **security breach** or **privacy breach**, provided that:

a. Such **claim** is first made against the **insured** during the **policy period**;
b. Such **claim** is reported to **us** during the **policy period**; and
c. The **security breach** or **privacy breach** occurs or first commences on or after the **retroactive date**.

4. <u>Coverage D - Privacy Breach Response Costs, Patient Notification Expenses and Patient Support and Credit Monitoring Expenses</u>:  **We** agree to pay all reasonable and necessary amounts within the applicable limit of insurance set forth in Section IV - Limits of Insurance, which the **insured** incurs as **privacy breach response costs**, **patient notification expenses** and/or **patient support and credit monitoring expenses** during the **policy period** as a direct result of a **security breach** or **privacy breach**, provided that:

a. A **claim** is first made by the **insured** during the **policy period**;
b. The **security breach** or **privacy breach** occurs or first commences on or after the **retroactive date**; and
c. The **insured** reports the **security breach** or **privacy breach** to **us** no later than 60 days from the date any **insured** first discovers the **security breach** or **privacy breach**.

5. <u>Coverage E - Network Asset Protection</u>:

a. Loss of Digital Assets

**We** agree to pay all reasonable amounts within the applicable limit of insurance set forth in Section IV - Limits of Insurance, which the **insured** incurs as **digital assets loss** and/or **special expenses** during the **policy period** because of a **covered cause of loss**, which directly causes damage, alteration, corruption, distortion, theft, misuse or destruction of the **insured's digital assets**, provided that:

(1) Such damage, alteration, corruption, distortion, theft, misuse or destruction of the **insured's digital assets** is directly caused by a **covered cause of loss** that occurs or first commences during the **policy period**;
(2) The **insured** provides clear evidence that the **digital assets loss** and/or **special expenses** directly resulted from a **covered cause of loss**;
(3) A **claim** is first made by the **insured** during the **policy period**; and
(4) The **insured** reports the **covered cause of loss** to **us** no later than 60 days from the date any **insured** first discovers the **covered cause of loss**.

**Digital assets loss** and/or **special expenses** will be reimbursed for a period of up to twelve (12) months following the discovery of the damage, alteration, corruption, distortion, theft, misuse or destruction of the **insured's digital assets**.

b. Non-Physical Business Interruption and Extra Expense

**We** agree to pay all reasonable amounts within the applicable limit of insurance set forth in Section IV - Limits of Insurance, which the **insured** incurs as **income loss**, **interruption expenses** and/or **special expenses** during the **period of restoration** because of a **covered cause of loss**, which directly causes a total or partial interruption, degradation in service or failure of the **insured's computer system**, provided that:

(1) Such total or partial interruption, degradation in service or failure of the **insured's computer system** is directly caused by a **covered cause of loss** that occurs or first commences during the **policy period**;
(2) The **insured** provides clear evidence that the **income loss**, **interruption expenses** and/or **special expenses** directly resulted from a **covered cause of loss**;
(3) A **claim** is first made by the **insured** during the **policy period**;
(4) The **insured** reports the **covered cause of loss** to **us** no later than 60 days from the date any **insured** first discovers the **covered cause of loss**; and
(5) The total or partial interruption, degradation in service or failure of the **insured's computer system** exceeds the **waiting period**.

6. <u>Coverage F - Cyber Extortion</u>:  **We** agree to pay all reasonable amounts within the applicable limit of

insurance set forth in Section IV - Limits of Insurance, which the **insured** incurs as **cyber extortion expenses** and/or **cyber extortion monies** because of a **cyber extortion threat**, provided that:

a.   Such **cyber extortion threat** is first made against the **insured** during the **policy period**;
b.   The **insured** provides clear evidence that the **cyber extortion expenses** and/or **cyber extortion monies** directly resulted from a **cyber extortion threat**;
c.   A **claim** is first made by the **insured** during the **policy period**; and
d.   The **insured** reports the **cyber extortion threat** to **us** no later than 60 days from the date the **cyber extortion threat** is made against the **insured**.

**Cyber extortion expenses** and/or **cyber extortion monies** shall not be paid without **our** prior consultation and written authorization.  The **insured** must make every reasonable effort to notify local law enforcement authorities and the Federal Bureau of Investigation or similar equivalent foreign agency before surrendering any **cyber extortion monies** in response to a **cyber extortion threat**.

7.   <u>Coverage G - Cyber Terrorism</u>:  **We** agree to pay all reasonable amounts within the applicable limit of insurance set forth in Section IV - Limits of Insurance, which the **insured** incurs as **income loss**, **interruption expenses** and/or **special expenses** during the **period of restoration** because of an **act of cyber terrorism**, which directly causes a total or partial interruption, degradation in service or failure of the **insured's computer system**, provided that:

a.   Such total or partial interruption, degradation in service or failure of the **insured's computer system** is directly caused by an **act of cyber terrorism** that occurs or first commences during the **policy period**;
b.   The **insured** provides clear evidence that the **income loss**, **interruption expenses** and/or **special expenses** directly resulted from **an act of cyber terrorism**;
c.   A **claim** is first made by the **insured** during the **policy period**;
d.   The **insured** reports the **act of cyber terrorism** to **us** no later than 60 days from the date any **insured** first discovers the **act of cyber terrorism**; and
e.   The total or partial interruption, degradation in service or failure of the **insured's computer system** exceeds the **waiting period**.

8.   <u>Coverage H - PCI DSS Assessment</u>:  **We** agree to pay all amounts within the applicable limit of insurance set forth in Section IV - Limits of Insurance, which the **insured** becomes legally obligated to pay as a **PCI DSS assessment**, and related **defense costs**, because of a **claim** that directly results from a **security breach** or **privacy breach**, provided that:

a.   Such **claim** is first made against the **insured** during the **policy period**;
b.   Such **claim** is reported to **us** during the **policy period**; and
c.   The **security breach** or **privacy breach** occurs or first commences on or after the **retroactive date**.

9.   <u>Coverage I - BrandGuard™</u>:  Subject to the applicable limit of insurance set forth in Section IV - Limits of Insurance, **we** agree to indemnify the **insured** for provable and ascertainable **brand loss** that such **insured** sustains after the **waiting period**, but during the **period of indemnity**, as a direct result of an **adverse media report** or **notification**, provided that:

a.   A **claim** for **brand loss** is first made by the **insured** during the **policy period**;
b.   The **adverse media report** or **notification** results from a **privacy breach** or **security breach** that occurs or first commences on or after the **retroactive date**;
c.   The **insured** provides clear evidence that the **brand loss** directly resulted from the **adverse media report** or **notification**; and
d.   The **insured** reports the **brand loss** to **us** no later than 60 days from the date the **adverse media report** or **notification** is discovered.

**B.   Exclusions**

1.   **We** are not obligated to defend or pay any **claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

a. Any **multimedia peril**, **security and privacy wrongful act**, **security breach**, **privacy breach**, **covered cause of loss**, **cyber extortion threat**, **act of cyber terrorism**, **adverse media report**, **notification**, or fact, circumstance or situation:

   (1) That was reported to **us** or to any other insurer prior to the initial inception date of this coverage;

   (2) That was the subject of any written demand for monetary damages, administrative or arbitration proceeding or litigation commenced against any **insured** prior to the initial inception date of this coverage, or that involves the same or substantially the same facts, circumstances or situations underlying or alleged in the prior demand, proceeding or litigation;

   (3) That was identified in any summary or statement of **claims** or potential **claims** submitted to **us** in connection with the application for insurance;

   (4) That occurred before the initial inception date of this coverage, if on the initial inception date of this coverage, any **insured** knew, or should have known, that such **multimedia peril**, **security and privacy wrongful act**, **security breach**, **privacy breach**, **covered cause of loss**, **cyber extortion threat**, **act of cyber terrorism**, **adverse media report**, **notification**, or fact, circumstance or situation was likely to result in a **claim**.

b. The actual, alleged or threatened discharge, dispersal, release or escape of pollutants, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste.

   For purposes of this exclusion, "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including mold, smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products and waste, and any electric, magnetic or electromagnetic field of any frequency.  "Waste" includes, but is not limited to, material to be recycled, reconditioned or reclaimed.

c. Any liability the **insured** assumes under a contract or agreement. This exclusion does not apply if the **insured** would have been liable in the absence of the contract or agreement. With respect to a **multimedia peril**, **security breach** or **privacy breach**, this exclusion does not apply to liability assumed by the **insured** in the form of a written hold harmless or indemnity agreement that predates such **multimedia peril**, **security breach** or **privacy breach**.

d. Any actual or alleged breach of contract, warranty, guarantee or promise. This exclusion does not apply if the **insured** would have been liable in the absence of such contract, warranty, guarantee or promise. This exclusion does not apply to a **claim** alleging breach of the **insured's** privacy policy.

e. Any business, joint venture or enterprise not named as the **policyholder** or an **insured organization** in the **Coverage Summary**.

f. Any conduct, act, error or omission of any individual serving in any capacity other than as the **insured's** principal, partner, officer, director or employee.

g. Any **insured** gaining in fact any profit, remuneration or financial advantage to which such party was not legally entitled.

h. Any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by the **insured**, if judgment or other final adjudication adverse to the **insured** establishes such an act, omission or willful violation.  This exclusion does not apply to any **insured** that did not commit, participate in, or have knowledge of any such act, omission or violation of law described in this exclusion.  This exclusion does not apply to an otherwise covered **claim** under Coverage E resulting from employee sabotage.

i. Any matter that is covered under any General Liability, Comprehensive General Liability, Professional Liability Insurance Policy, or other coverage part of the  **policy**.

j. Any actual or alleged violation of the False Claims Act, or any similar federal or state law, rule or regulation concerning billing errors or fraudulent billing practices or abuse.

k.  Any actual or alleged infringement of any patent or trade secret.

l.  Any actual or alleged unfair competition, price fixing, deceptive trade practices, restraint of trade or a violation of any securities or anti-trust laws.

m.  Any obligation of the **insured** under a worker's compensation, employer's liability, disability benefits or unemployment compensation law, or any similar law, or any other employment or employment-related matter.  This exclusion does not apply to an otherwise covered **claim** under Coverage B alleging a **security and privacy wrongful act**.

n.  Any actual or alleged **bodily injury** or **property damage**.

o.  Any actual or alleged harassment or discrimination, including, but not limited to, harassment or discrimination because of, or relating to, race, creed, color, age, sex, sexual orientation or preference, national origin, religion, handicap, disability, political affiliation or marital  status or  any  other  basis prohibited by federal, state or local law.

p.  Any actual or alleged satellite failures; electrical or mechanical failures and/or interruption, including, but not limited to, electrical disturbance, electrical power interruption, spike, surge, brownout or blackout; or outages to gas, water, telephone, cable, telecommunications or other infrastructure, unless such infrastructure is under the **insured's** direct operational control.  This exclusion does not apply to an otherwise covered **claim** under Coverage E or G.

q.  The **insured's** insolvency, receivership, bankruptcy, liquidation or financial inability or other inability to pay or perform its obligations or conduct its business; or any other individual or entity's insolvency, receivership, bankruptcy, liquidation or financial inability or other inability to pay or perform or conduct its business.

r.  Any matter brought by or on behalf of:

(1)  Any **insured** against another **insured**; or
(2)  Any entity which is owned, operated, managed, or controlled, directly or indirectly, in whole or in part by the **insured**; or any entity directly or indirectly controlled, operated or managed by the **insured**;
(3)  Any entity which is a parent, affiliate or subsidiary of any entity in which the **insured** is a partner or joint venturer; or
(4)  Any individual who is a partner or joint venturer of any entity in which the **insured** is also a partner or joint venturer.

This exclusion does not apply to an otherwise covered **claim** under Coverage B alleging a **security and privacy wrongful act**.

s.  An actual or alleged violation of any of the United States of America's economic or trade sanctions, including but not limited to, sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

t.  An actual or alleged failure to render medical services.

u.  The wear and tear, drop in performance, failure to maintain, or progressive deterioration or aging of the **insured's** electronic equipment or **computer hardware**.

v.  The failure of overhead transmission and distribution lines.

w.  The gradual deterioration of subterranean insulation.

x.  Fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, force majeure or any other physical event, however caused.  This exclusion does not apply to an otherwise covered **claim** under Coverage E or G.

y.   The gradual deterioration, wear and tear, latent or time-delayed damage of the **insured's computer system**; or the **insured's** failure, or the failure of those acting on the **insured's** behalf, to maintain any computer, **computer system** or network, computer software or any other equipment.

z.   The actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services.

aa.  Cost guarantees, cost representations, contract price or cost estimates being exceeded.

bb.  Any actual or alleged medical malpractice or professional liability errors or omissions other than those specifically covered by this Endorsement.

cc.  Unauthorized trading. For purposes of this exclusion, "unauthorized trading" means trading, which at the time of the trade is:

(1)   In excess of permitted financial limits, or
(2)   Outside of permitted product lines.

dd.  The actual or alleged purchase, sale, offer, or solicitation of an offer to purchase or sell securities; the loss of value of any securities; or any actual or alleged violation of any securities law such as the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002 or any regulation promulgated under the foregoing statutes, or any federal, state, local, or foreign laws similar to the foregoing statutes, including 'Blue Sky' laws, whether such law is statutory, regulatory or common law.

ee.  Actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as 'Racketeer Influenced And Corrupt Organizations Act' or 'RICO'), as amended, or any regulation promulgated under the foregoing statute, or any similar federal, state, local or foreign laws, whether such law is statutory, regulatory or common law.

ff.  Any matter brought by the Federal Trade Commission, the Federal Communications Commission or any other federal, state or local governmental entity, in such entity's regulatory or official capacity. This exclusion does not apply to an otherwise covered **claim** under Coverage C.

gg.  The violation of any pension, healthcare, welfare, profit sharing or mutual or investment plans, funds or trusts; or the violation of any provision of the Employee Retirement Income Security Act of 1974 and its amendments and/or the Pension Protection Act of 2006 and its amendments, or any regulation, ruling or order issued pursuant thereto.

hh.  Labor strikes or similar labor actions.

ii.  War, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of or amounting to a popular uprising, military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions; or the confiscation, nationalization, requisition or destruction of, or damage to, property by or under the order of any government or public or local authority; or any action taken in controlling, preventing, suppressing or in any way relating to any of the above. This exclusion does not apply to an **act of cyber terrorism**.

jj.  The **insured's** commercial decision to cease providing a particular product or service, but only if the **insured** is contractually obligated to continue providing such products or services.

kk.  Gambling or pornography; prizes, awards or coupons; or the sale or provision of illegal, prohibited, restricted or regulated items such as alcoholic beverages, tobacco or drugs.

ll.  The use of programs that are not **operational programs** or **delivered programs**.

mm.  The **insured's** intentional use of illegal or unlicensed programs that are in violation of the provisions or laws referring to software protection.

Healthcare Professional Liability Policy
CyberAssurance Endorsement
©2016 ProAssurance Corporation

nn.   The confiscation, commandeering, requisition, destruction of, or damage to **computer hardware** by order of a government de jure or de facto or by any public authority for whatever reason.

oo.   The existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment or that affects the value, marketability, condition or use of any property.

2.   With respect to Coverages  A, B, C, D, H, and I only, **we** are not obligated to defend or pay any **claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an actual or alleged **multimedia peril**, **security and privacy wrongful act**, **security breach** or **privacy breach** occurring before the **retroactive date**; or an actual or alleged **multimedia peril**, **security and privacy wrongful act**, **security breach** or **privacy breach** occurring on or after the **retroactive date**, which, together with an actual or alleged **multimedia peril**, **security and privacy wrongful act**, **security breach** or **privacy breach** occurring before the **retroactive date** would constitute related acts, errors, omissions, **multimedia perils**, **security and privacy wrongful acts**, **security breaches** or **privacy breaches**.

For purposes of this exclusion, **multimedia perils**, **security and privacy wrongful acts**, **security breaches** and **privacy breaches** will be deemed related if they are logically or causally connected by any common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

3.   With respect to Coverage E.a. (Loss of Digital Assets) only,  **we** are not obligated to pay any of the following:

a.   Any amount incurred in restoring, updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
b.   Physical damage to the **computer hardware** or **data** center, other than that covered under **covered cause of loss**, paragraph 1(a);
c.   Contractual penalties or consequential damages;
d.   Any liability to third parties for whatever reason, including legal costs and expenses of any type;
e.   Fines or penalties imposed by law;
f.   The economic or market value of  **digital assets**;
g.   Costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;
h.   Costs to upgrade, redesign, reconfigure or maintain the **insured's computer system** to a level of functionality beyond that which existed prior to the  **covered cause of loss**; or
i.   Any losses paid under Coverage E.b. (Non-Physical Business Interruption and Extra Expense).

4.   With  respect to Coverage E.b. (Non-Physical Business Interruption and Extra Expense) only, **we** are not obligated to pay any of the following:

a.   Any loss arising out of a physical cause or natural peril, including, but not limited to fire, wind, water, flood, subsidence or earthquake, which results in physical damage to **computer hardware** and/or any **data** center;
b.   Any loss expense arising out of updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
c.   Contractual penalties or consequential damages;
d.   Any liability to third parties for whatever reason, including legal costs and expenses of any type;
e.   Fines or penalties imposed by law;
f.   Costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;
g.   Loss of goodwill and reputational harm;
h.   Costs to upgrade, redesign, reconfigure or maintain the **insured's computer system** to a level of functionality beyond that which existed prior to the  **covered cause of loss**; or
i.   Any losses paid under Coverage E.a. (Loss of Digital Assets).

5.   With respect to Coverage I only, **we** are not obligated to pay any of the following:

a.   Any amounts incurred by the **insured** in an effort to re-establish the **insured's reputation**, including

**public relations expenses**;

b.   Any amounts incurred in any **claim** that is insured by any other insurance, except excess insurance;

c.   Any amounts incurred in connection with an **adverse media report** that also affects or refers in similar terms to a general security issue, an industry or the **insured's** specific competitors without any specific allegations regarding a **privacy breach** or **security breach** by the **insured**, a **BPO service provider**, an **outsourced IT service provider**, or others acting on the **insured's** behalf and for whom the **insured** is legally responsible;

d.   Any civil or regulatory liability to third parties for whatever reason, including legal costs and expenses of any type;

e.   Contractual penalties or consequential damages;

f.   **Privacy breach response costs**, **patient notification expenses** or **patient support and credit monitoring expenses** paid under Coverage D; or

g.   Fines or penalties imposed by law or regulation.

## SECTION II - CONDITIONS

### A.   Notice of Claim

1.   If a **claim** under Coverage A, B, C or H is made against the **insured**, the **insured** must give **us** or **our** authorized agent written notice of such **claim** during the **policy period** or during an extended reporting period, if applicable.

2.   If the **insured** has a **claim** under Coverage D, E, F, G or I, the **insured** must give **us** or **our** authorized agent written notice of such **claim** no later than sixty (60) days from the date any **insured** first discovers the **security breach**, **privacy breach**, **covered cause of loss**, **cyber extortion threat** or **act of cyber terrorism** giving rise to such **claim**, or during an extended reporting period, if applicable.

3.   The **insured** shall provide **us** with copies of all documentation comprising the **claim** as well as all authorization, cooperation, or assistance as **we** may require.

4.   **We** are not obligated to pay any **loss**, **defense costs**, **regulatory compensatory awards**, **regulatory fines and penalties**, **privacy breach response costs**, **patient notification expenses**, **patient support and credit monitoring expenses**, **digital assets loss**, **special expenses**, **income loss**, **interruption expenses**, **cyber extortion expenses**, **cyber extortion monies**, **brand loss**, or **PCI DSS assessments** that are incurred prior to notification of a **claim**.

### B.   Notice of Potential Claim

If, during the **policy period**, the **insured** first becomes aware of any facts or circumstances which could give rise to a **claim** covered under this Endorsement, and if the **insured**, during the **policy period**, provides **us** with written notice of:

1.   Details regarding such facts or circumstances;

2.   The nature of the alleged or potential damages;

3.   The identity of the potential claimant(s) and **insured(s)** involved;

4.   The manner in which the **insured** first became aware of the facts or circumstances; and

5.   The consequences which have resulted or may result,

then any **claim** subsequently arising from such reported facts or circumstances will be deemed to be a **claim** first made on the date when notice complying with the foregoing requirements is received by **us**.

### C.   Defense

**We** have the right and duty to defend any **claim** under this Endorsement, even if the allegations of the **claim** are

groundless, false or fraudulent. **We** have the right to select and retain counsel to defend the **insured**. Any **defense costs** paid under this Endorsement will reduce the limits available under this Endorsement to pay for **loss**, **regulatory compensatory awards**, **regulatory fines and penalties**, **privacy breach response costs**, **patient notification expenses**, **patient support and credit monitoring expenses**, **digital assets loss**, **special expenses**, **income loss**, **interruption expenses**, **cyber extortion expenses**, **cyber extortion monies**, **brand loss** and/or **PCI DSS assessments**. **We** may investigate any **claim** as **we** deem appropriate. **We** shall not be obligated to pay, defend, investigate or settle, or to continue to pay, defend, investigate or settle, any **claim** under any Coverage after the applicable limit of liability set forth in Section IV - Limits of Insurance or the annual aggregate limit has been exhausted. **We** shall have the right to withdraw from the further defense of any **claim** by tendering control of such defense to the **insured**, and **we** shall have no other obligation or liability to pay any amounts under this Endorsement after the applicable limit of liability set forth in Section IV - Limits of Insurance or the annual aggregate limit has been exhausted.

**D.    Settlement**

1.    **We** have the right to settle any **claim** under Coverages A, B, C, and H in the manner and to the extent that **we** believe is proper.

2.    The **insured** shall not incur any amounts to which this Endorsement applies, or settle, offer to settle, assume any contractual obligation, admit liability, voluntarily make any payment or confess or otherwise consent to any damages or judgments without **our** prior written consent, which will not be unreasonably withheld. **We** will not be liable for any costs, expenses, settlement, assumed obligation, admitted liability, voluntary payment, or confessed damages or judgments to which **we** have not consented.

**E.    Loss Determination under Coverages E, G and I**

1.    Digital Assets Loss:     For any and all coverage provided under Coverage E.a., **digital assets loss** will be determined as follows:

 a.    If the impacted **digital asset** was purchased from a third party, **we** will pay only the lesser of the original purchase price of the **digital asset** or the reasonable and necessary **digital assets loss**.

 b.    If it is determined that the **digital assets** cannot be replaced, restored or recreated, **we** will reimburse only the actual and necessary **digital assets loss** incurred up to such determination.

2.    Income Loss:     For any and all coverage provided under Coverage E.b. and Coverage G, **income loss** will be determined as the reduction of the **insured's** income during the **period of restoration**, which is:

 a.    The **insured's** net income (net profit or loss before income taxes) that would have been reasonably projected, but which has been lost directly as a result of the total or partial interruption, degradation in service, or failure of the **insured's computer system** caused directly by a **covered cause of loss** or an **act of cyber terrorism**. The revenue projection will take into account the prior experience of the **insured's** business preceding the date of the **covered cause of loss** or the **act of cyber terrorism** and the probable experience had no **covered cause of loss** or **act of cyber terrorism** occurred. Revenues include the amount of money paid or payable to the **insured** for goods, products or services sold, delivered or rendered in the normal course of the **insured's** business. Revenue projection will be reduced by the extent to which the **insured** uses substitute methods, facilities or personnel to maintain its revenue stream. **We** will take into consideration the **insured's** documentation of the trends in its business and variations in, or other circumstances affecting, its business before or after the **covered cause of loss** or **act of cyber terrorism**, which would have affected the **insured's** business had no **covered cause of loss** or **act of cyber terrorism** occurred; and

 b.    Any fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such operating expenses must continue during the **period of restoration**.

3.    BrandGuard™: For any and all coverage provided under Coverage I, the revenue projection required to calculate **brand loss** will take into account the prior experience of the **insured's** business preceding the date of the **adverse media report** or **notification**, whichever applies, and the probable experience had no **adverse media report** been published or **notification** occurred. Revenues include the amount of money paid or payable to the **insured** for goods, products or services sold, delivered or rendered in the normal

course of the **insured's** business. Revenue projection will be reduced by the extent to which the **insured** uses substitute methods, facilities, or personnel to maintain its revenue stream. **We** will take into consideration the **insured's** documentation of the trends in the **insured's** business and variations in, or other circumstances affecting, the **insured's** business before or after the **adverse media report** or **notification**, which would have affected the **insured's** business had no **adverse media report** been published or **notification** occurred. Any fixed operating expenses (including ordinary payroll) incurred will be considered in calculating **brand loss**, but only to the extent that such operating expenses must continue during the **period of indemnity**.

## F.   Extended Reporting Period

1.   If an Extended Reporting Period Endorsement is issued to an **insured organization** or an **insured professional** in accordance with the reporting endorsement provisions in the professional liability coverage part of the **policy**, then the period for reporting **claims** under this Endorsement will be automatically extended for one (1) year immediately following termination of the **policy** ("extended reporting period"), but only for:

   a.   **Claims** under Coverage A, B, C, D, H or I of this Endorsement which:

      (1)   Arise out of a **multimedia peril**, **security and privacy wrongful act**, **security breach** or **privacy breach** occurring or first commencing on or after the **retroactive date** and before the end of the **policy period**; and
      (2)   Are first made and reported during the extended reporting period.

   b.   **Claims** under Coverage E, F, or G of this Endorsement which:

      (1)   Arise out of a **covered cause of loss**, **cyber extortion threat** or **act of cyber terrorism** occurring or first commencing during the **policy period**; and
      (2)   Are reported to **us** during the extended reporting period.

2.   Cancellation or termination, for any reason, of an Extended Reporting Period Endorsement automatically terminates the period for reporting **claims** under this Endorsement.   If an Extended Reporting Period Endorsement is not issued for an **insured organization** or an **insured professional**, then coverage under this Endorsement for such **insured organization** or **insured professional** terminates at the end of the **policy period**.

3.   All terms and conditions of this Endorsement, including the coverage limits set forth in Section IV - Limits of Insurance, will continue to apply during any Extended Reporting Period.

4.   The existence of an Extended Reporting Period will not increase or reinstate any Coverage Limit or the Annual Aggregate Limit.

5.   If this Endorsement attaches to a professional liability occurrence form that is cancelled or not renewed, then the period for reporting **claims** under this Endorsement will be automatically extended for one (1) year immediately following termination or expiration of the  **policy** ("extended reporting period"), but only for:

   a.   **Claims** under Coverage A, B, C, D, H or I of this Endorsement which:

      (1)   Arise out of a **multimedia peril**, **security and privacy wrongful act**, **security breach** or **privacy breach** occurring or first commencing on or after the **retroactive date** and before the end of the **policy period**; and
      (2)   Are first made and reported during the extended reporting period.

   b.   **Claims** under Coverage E, F, or G of this Endorsement which:

      (1)   Arise out of a **covered cause of loss**, **cyber extortion threat** or **act of cyber terrorism** occurring or first commencing during the **policy period**; and
      (2)   Are reported to **us** during the extended reporting period.

Healthcare Professional Liability Policy
CyberAssurance Endorsement
©2016 ProAssurance Corporation

**G.    Arbitration**

Notwithstanding any other provision of this Endorsement or the **policy**, any irreconcilable dispute between the **insured** and **us** is to be settled by arbitration in accordance with the then current Commercial Rules of the American Arbitration Association.  Judgment upon the award may be entered in any court having jurisdiction.  The arbitrator has the power to decide any dispute between the **insured** and **us** concerning the application or interpretation of this Endorsement.  However, the arbitrator shall have no power to change or add to the provisions of this Endorsement.  Prior to the beginning of arbitration, each disputing party shall pay an equal share of the estimated cost of arbitration.

**H.    Other Insurance**

The coverage provided by this Endorsement is excess insurance over any other valid and collectible insurance available to the **insured**, including any self-insured retention or deductible portion thereof, whether such insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such insurance specifically applies as excess insurance over this Endorsement.

**I.    Cooperation**

All **insureds** must cooperate with **us** and with legal counsel retained by **us** to defend any **insured** and assist in the conduct of lawsuits, appeals and other proceedings and in enforcing any right of contribution or indemnity against any person or organization who may be liable.  The **insureds** must attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. With respect to the insurance afforded under this Endorsement, the **insureds** must not, except at their own cost, voluntarily make payment, assume any obligation or incur any expense.

**SECTION III - WHO IS AN INSURED**

Each of the following is an **insured** under this Endorsement to the extent set forth below:

**A.**    Any **insured organization**;

**B.**    Any **insured professional**;

**C.**    Any executive officer, partner, administrator, stockholder or member of the board of directors, trustees or governors of an **insured organization**, but only while acting within the course and scope of his or her duties on behalf of such **insured organization**; and

**D.**    Any full-time, part-time, seasonal or temporary employee of an **insured organization** or **insured professional**, but only while acting within the course and scope of his or her duties on behalf of such **insured organization** or **insured professional**.

All persons who qualify as an **insured** under paragraph C and D above shall share in the limits of liability of the **insured organization** or **insured professional**. **We** have the sole discretion to allocate **claims** paid, if any, against the appropriate limits of liability.

**SECTION IV - LIMITS OF INSURANCE**

**A.    Each Claim Limits**

1.    With respect to the coverage provided under this Endorsement, the limits of insurance are as follows:

|   | Coverage | Limit of Liability |
|---|----------|--------------------|
| A | Multimedia Liability | $100,000 each **claim** |
| B | Security and Privacy Liability | $100,000 each **claim** |
| C | Privacy Regulatory Defense and Penalties | $100,000 each **claim** |
| D | Privacy Breach Response Costs, Patient Notification Expenses, and Patient Support and Credit Monitoring Costs | $100,000 each **claim** |
| E | Network Asset Protection | $100,000 each **claim** |
| F | Cyber Extortion | $100,000 each **claim** |
| G | Cyber Terrorism | $100,000 each **claim** |
| H | PCI DSS Assessment | $100,000 each **claim** |
| I | BrandGuard™ | $100,000 each **claim** |

2.  Subject to the Annual Aggregate Limit, the "each **claim**" limit stated in paragraph 1 above is the most **we** will pay for each **claim** under each Insuring Agreement of this Endorsement, including **defense costs** where applicable.

3.  Subject to Section IV - Limits of Insurance, item D - Related Claims, the "each **claim**" limit will apply separately to each **insured professional** and each **insured organization**.

**B.  Each Insured Professional Annual Aggregate Limit**

1.  The annual aggregate limit of liability under this Endorsement for each **insured professional** is $100,000 for all coverages combined. The annual aggregate limit for an **insured professional** includes **defense costs**.

2.  **Loss, defense costs**, **regulatory compensatory awards**, **regulatory fines and penalties**, **privacy breach response costs**, **patient notification expenses**, **patient support and credit monitoring expenses**, **digital assets loss**, **special expenses**, **income loss**, **interruption expenses**, **cyber extortion expenses**, **cyber extortion monies**, **brand loss**, and **PCI DSS assessments** are part of, and not in addition to, the "each **claim**" limit and the annual aggregate limit for an **insured professional**.

3.  If the annual aggregate limit for an **insured professional** is exhausted by payment of **loss**, **defense costs**, **regulatory compensatory awards**, **regulatory fines and penalties**, **privacy breach response costs**, **patient notification expenses**, **patient support and credit monitoring expenses**, **digital assets loss**, **special expenses**, **income loss**, **interruption expenses**, **cyber extortion expenses**, **cyber extortion monies**, **brand loss**, or **PCI DSS assessments**, or any combination thereof, then **our** obligations under this Endorsement shall be deemed completely fulfilled and extinguished for such **insured professional**.

**C.  The Insured Organization Annual Aggregate Limit**

1.  The annual aggregate limit of liability under this Endorsement for an **insured organization** is based on the size of the **insured organization** as of the effective date of this Endorsement and will be determined in accordance with the following table:

|                  |           |
|------------------|-----------|
| 1 Physician      | $100,000  |
| 2-10 Physicians  | $200,000  |
| 11-20 Physicians | $350,000  |
| 21+ Physicians   | $500,000  |

The annual aggregate limit for an **insured organization** includes **defense costs**.

2.  In no event will **we** pay more than the annual aggregate limit for an **insured organization**. If the **Coverage Summary** does not show separate limits of liability for an **insured organization**, then such **insured organization** shall share in the limits of liability of only one **insured** who holds separate limits of liability, as shown on the **Coverage Summary**. **We** have the sole discretion to allocate **claims** paid, if any, against the appropriate limit of liability.

3.  **Loss**, **defense costs**, **regulatory compensatory awards**, **regulatory fines and penalties**, **privacy breach**

**response costs**, **patient notification expenses**, **patient support and credit monitoring expenses**, **digital assets loss**, **special expenses**, **income loss**, **interruption expenses**, **cyber extortion expenses**, **cyber extortion monies**, **brand loss**, and **PCI DSS assessments** are part of, and not in addition to, the "each **claim**" limit and the annual aggregate limit for an **insured organization**.

4.  If the annual aggregate limit for an **insured organization** is exhausted by payment of **loss**, **defense costs**, **regulatory compensatory awards**, **regulatory fines and penalties**, **privacy breach response costs**, **patient notification expenses**, **patient support and credit monitoring expenses**, **digital assets loss**, **special expenses**, **income loss**, **interruption expenses**, **cyber extortion expenses**, **cyber extortion monies**, **brand loss**, or **PCI DSS assessments**, or any combination thereof, then **our** obligations under this Endorsement shall be deemed completely fulfilled and extinguished for such **insured organization**.

**D.   Related Claims**

1.  With regard to Coverages A, B, C, and H, all related **claims** made against the **insured** will be considered a single **claim**, and only one "each **claim**" limit will apply to such **claim**. Such **claim** shall be deemed to have been first made on the date the earliest of the related **claims** was first made against the **insured** and shall be deemed to have been first reported to **us** on the date the earliest of the related **claims** was first reported to **us**. Appeals and any post-trial proceedings shall be considered to be part of the original **claim**. **Claims** will be deemed related if they are logically or causally connected by any common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions.

2.  With regard to Coverages D, E, F, G and I, all **claims** arising out of the same, related or continuing incident(s), act(s), fact(s) or circumstance(s) will be considered a single **claim**, and only one "each **claim**" Limit of Liability will apply, regardless of the number of **insureds** involved or affected. All such **claims** will be deemed first made on the date the earliest of such **claims** is first made.

3.  If a **claim** is covered under more than one of the Coverages of this Endorsement, then only one "each **claim**" limit will apply. **We** have the sole discretion to allocate **claims** paid, if any, against the appropriate limit of liability.

**SECTION V - DEFINITIONS**

With respect to the coverage provided by this Endorsement, certain words are shown in bold face print and are defined as follows. Refer to the Definitions section in the professional liability coverage part of the **policy** for terms that are shown in bold in this Endorsement, but are not defined below. If a term is defined below and in the professional liability coverage part of the **policy**, the definition below applies to the coverage provided by this Endorsement.

**A.   Acquiring bank** means a bank or financial institution that accepts credit and/or debit card payments (including credit cards, debits cards, stored value cards and pre-paid cards) for products or services on behalf of a merchant, including processing and crediting those payments to a merchant's account.

**B.   Act of cyber terrorism** means the premeditated use of disruptive activities, or the threat thereof, against computers, **computer systems**, networks and/or public Internet by any person or group(s) of persons, whether acting alone or on behalf of, or in connection with, any organization(s) or government(s) with the intention to intimidate or cause destruction or harm and/or to further social, ideological, religious, political or similar objectives. **Act of cyber terrorism** includes, but is not limited to, the use of information technology to organize and execute large-scale attacks against **computer systems**, networks and/or public internet resulting in disabling and/or deleting critical infrastructure, **data** or information.

**C.   Adverse media report** means any unpredictable report or communication of an actual or potential **security breach** or **privacy breach**, which:

1.  Has been publicized through any media channel including, but not limited to, television, **print media**, radio or electronic networks, the Internet, and/or electronic mail;
2.  Threatens material damage to the **insured's reputation** or brands; and
3.  Results in the **insured** incurring **privacy breach response costs**.

**D.   Assumed under contract** means liability for **damages** resulting from a **multimedia peril** where such liability has

been assumed by the **insured** in the form of a written hold harmless or indemnity agreement that predates the first **multimedia peril**.

E.   **Bodily injury** means physical injury, sickness, disease, pain or death, and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or emotional distress sustained by a person at any time.

F.   **BPO service provider** means any third-party independent contractor that provides business process outsourcing services for the **insured's** benefit under a written contract with the **insured** to provide such services, including, but not limited to, call center services, fulfillment services, and logistical support.

G.   **Brand loss** means the **insured's** revenue as could have been reasonably projected immediately prior to **notification** or, in the event of an **adverse media report**, immediately prior to the publication of an **adverse media report**, but which has been lost after the **waiting period** but otherwise during the **period of indemnity** as a direct result of such **notification** or **adverse media report**, less the variable costs (including the cost of raw materials and all other costs) that would have been incurred during the same period, but were saved as a result. **Brand loss** will be determined in accordance with Section II Conditions, paragraph E.3. of this Endorsement.

H.   **Card association** means Visa International, MasterCard, Discover, JCB American Express and any similar credit or debit card association that is a participating organization of the Payment Card Industry Security Standards Council.

I.   **Claim(s)** means:

1.   With respect to Coverages A and B only:

a.   A written demand for monetary damages or other non-monetary relief against the **insured**;
b.   Any **suit** commenced against the **insured** by the service of a complaint or similar pleading or notification; or
c.   A written request to toll or waive a statute of limitations relating to a potential **claim** against the **insured**, including any appeal therefrom.

A **claim** under Coverages A and B will be deemed to be first made when any of the foregoing is first received by the **insured**.

2.   With respect to Coverage C only, a **government investigation** commenced against the **insured** by letter notification, complaint or order of investigation.  A **claim** under Coverage C will be deemed to be first made when it is first received by the **insured**.
3.   With respect to Coverage D only, a written report by the **insured** to **us** of an **adverse media report**, **security breach** or **privacy breach**. A **claim** under Coverage D will be deemed to be first made when such written report is received by **us** or **our** authorized agent.
4.   With respect to Coverage E only, a written report by the **insured** to **us** of a **covered cause of loss**.  A **claim** under Coverage E will be deemed to be first made when such written report is received by **us** or **our** authorized agent.
5.   With respect to Coverage F only, a written report by the **insured** to **us** of a **cyber extortion threat**.  A **claim** under Coverage F will be deemed to be first made when such written report is received by **us** or **our** authorized agent.
6.   With respect to Coverage G only, a written report by the **insured** to **us** of an **act of cyber terrorism**.  A **claim** under Coverage G will be deemed to be first made when such written report is received by **us** or **our** authorized agent.
7.   With respect to Coverage H only, a written demand made against the **insured** by an **acquiring bank** or **card association** for a **PCI DSS assessment** due to such **insured's** non-compliance with **PCI Data Security Standards**.  A **claim** under Coverage H will be deemed to be first made when such written demand is received by the **insured**.
8.   With respect to Coverage I only, a written report by the **insured** to **us** of a **brand loss** directly caused by an **adverse media report** or **notification**.  A **claim** under Coverage I will be deemed to be first made when such written report is received by **us** or **our** authorized agent.

J.   **Computer hardware** means the physical components of any **computer system** including CPU's, memory, storage

devices, storage media, and input/output devices and other peripheral devices and components, including, but not limited to cables, connectors, fiber optics, wires, power supply units, keyboards, display monitors and audio speakers.

**K.** **Computer program(s)** means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner. **Computer program(s)** include but are not limited to communication systems, networking systems, operating systems, and related computer programs used to create, maintain, process, retrieve, store, and/or transmit electronic **data**.

**L.** **Computer system(s)** means interconnected electronic, wireless, web, or similar systems (including all **computer hardware** and software) used to process and store **data** or information in an analog, digital, electronic or wireless format including, but not limited to, **computer programs**, electronic **data**, operating systems, **firmware**, servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off line storage facilities (to the extent that they hold electronic **data**), and electronic backup equipment.

**M.** **Computer virus** means a program that possesses the ability to create replicas of itself (commonly known as 'auto-reproduction' program) within other programs or operating system areas or which is capable of spreading copies of itself wholly or partly to other **computer systems**.

**N.** **Covered cause of loss** means, and is limited to, the following:

1. Accidental Damage or Destruction

   a. Accidental physical damage or destruction of **electronic media**, so that stored **digital assets** are no longer machine-readable;
   b. Accidental damage or destruction of **computer hardware**, so that stored **data** is no longer machine-readable;
   c. Failure in power supply or under/over voltage only if such power supply is under the direct operational control of the **insured**. "Direct operational control" includes back-up generators;
   d. **Programming error** of **delivered programs**; or
   e. Electrostatic build-up and static electricity.

2. Administrative or Operational Mistakes

   An accidental, unintentional, or negligent act, mistake, error or omission by the **insured**, a **BPO service provider** or **outsourced IT service provider** in:

   a. The entry, or modification of the **insured's** electronic **data**, which causes damage to such **data**; or
   b. The creation, handling, development, modification or maintenance of the **insured's digital assets**; or
   c. The ongoing operation or maintenance of the **insured's computer system**, excluding the design, architecture, or configuration of the **insured's computer system**.

3. Computer Crime and Computer Attacks

   An act, mistake or negligent error or omission in the operation of the **insured's computer system** or handling of the **insured's digital assets** by the **insured**, a **BPO service provider** or **outsourced IT service provider**, which fails to prevent or hinder any of the following attacks on the **insured's computer system**:

   a. A **denial of service attack**;
   b. **Malicious code;**
   c. **Unauthorized access**; or
   d. **Unauthorized use**.

**O.** **Cyber extortion expenses** means all reasonable and necessary costs and expenses, other than **cyber extortion monies**, which the **insured** incurs, with **our** prior written consent, as a direct result of a **cyber extortion threat**.

**P.** **Cyber extortion monies** means any funds or property which the **insured** pays, with **our** prior written consent, to a person(s) or entity(ies) reasonably believed to be responsible for a **cyber extortion threat**, for the purpose of

terminating such **cyber extortion threat**.

**Q.**     **Cyber extortion threat** means a credible threat or series of related credible threats, including but not limited to a demand for **cyber extortion monies**, directed at the **insured** to:

1.  Release, divulge, disseminate, destroy or use the confidential information of a third party taken from the **insured** as a result of **unauthorized access** to, or **unauthorized use** of, the **insured's computer system**;
2.  Introduce **malicious code** into the **insured's computer system**;
3.  Corrupt, damage or destroy the **insured's computer system**;
4.  Restrict or hinder access to the **insured's computer system**, including, but not limited to the threat of a **denial of service attack**; or
5.  Electronically communicate with the **insured's** patients and falsely allege to be the **insured** or to be acting under the **insured's** direction in order to falsely obtain personal confidential information of the **insured's** patients (also known as "pharming," "phishing," or other types of false communications).

**R.**     **Data** means any machine-readable information including, but not limited to, ready-for-use programs, applications, account information, personally identifiable information, health and medical information, or other electronic information, irrespective of the way it is used or rendered.

**S.**     **Defense costs** means reasonable and necessary legal fees and related costs and expenses incurred in the investigation, defense and appeal of any **claim** under Coverage A, B, C or H. **Defense costs** shall not include any wages, salaries, fees, overhead or other charges incurred by, or paid to, any **insured** for time spent in cooperating in the defense and investigation of any **claim** or potential **claim** under this Endorsement.

**T.**     **Delivered programs** means programs, applications, and software in which the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

**U.**     **Denial of service attack** means an event caused by unauthorized or unexpected interference or a malicious attack intended by the perpetrator to overwhelm the capacity of a **computer system** by sending an excessive volume of electronic **data** to such **computer system** in order to prevent authorized access to such **computer system**.

**V.**     **Digital assets** means **data** and **computer programs** that exist in the **insured's computer system**. **Digital assets** does not include **computer hardware.**

**W.**     **Digital assets loss** means reasonable and necessary expenses and costs which the **insured** incurs to replace, recreate or restore **digital assets** to the same state and with the same contents immediately before they were damaged, destroyed, altered, misused, or stolen, including expenses for materials and machine time. **Digital assets loss** also includes amounts representing employee work time to replace, recreate or restore **digital assets**, which shall be determined on a predefined billable hours or per hour basis as based upon the **insured's** schedule of employee billable hours.

**X.**     **Electronic media** means floppy disks, CD ROM's, flash drives, hard drives, solid state drives, magnetic tapes, magnetic discs, or any other media on which electronic **data** is recorded or stored.

**Y.**     **Firmware** means the fixed programs that internally control basic low-level operations in a device.

**Z.**     **Government entity** means:

1.  Any department, agency, task force or other organization created by any United States federal or state law, regulation, rule or executive order; or
2.  Any department, agency, task force or other organization operated, funded or staffed, in whole or in part, by the United States federal government or any state government; or
3.  Any organization operating as a Medicare Integrity Program Contractor.

**AA.**   **Government investigation** means a formal investigation instituted against the **insured** by a **government entity**, the subject matter of which is a **privacy breach** or **security breach**.

**BB.**   **Income loss** means financial loss which the **insured** sustains, as determined in accordance with the provisions of

Coverage E.b. or G.

**CC.** **Insured** means any person, entity, or organization qualifying as such under Section III - Who Is An Insured of this Endorsement.

**DD.** **Insured's computer system** means:

1. A **computer system** operated by and either owned by, or leased to the **insured**;
2. With respect to Coverage B only, a **computer system** operated by a **BPO service provider** or **outsourced IT service provider** and used for the sole purpose of providing hosted computer application services to the **insured** or for processing, maintaining, hosting, or storing the **insured's** electronic **data**, pursuant to a written contract with the **insured** for such services.

**EE.** **Interruption expenses** means those expenses, excluding **special expenses**, which the **insured** incurs in accordance with the provisions of Coverage E.b. or G, to:

1. Avoid or minimize the suspension of the **insured's** business as a result of a total or partial interruption, degradation in service, or failure of the **insured's computer system** caused directly by a **covered cause of loss** or an **act of cyber terrorism**, which the **insured** would not have incurred had no **covered cause of loss** or **act of cyber terrorism** occurred, including, but not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of third party services, or additional staff expenditures or labor costs; and

2. Minimize or avoid a **covered cause of loss** or an **act of cyber terrorism** and continue the **insured's** business.

The amount of **interruption expenses** recoverable under paragraph 1 above shall in no case exceed the amount by which the covered **income loss** is reduced by such incurred expenses.

**FF.** **Loss** means the amount that the **insured** is legally obligated to pay as a result of a **claim** under Coverage A or B, including damages and judgments (including prejudgment and post-judgment interest awarded against the **insured** on that part of any judgment paid or to be paid by **us**); legal fees and costs awarded pursuant to such judgments; and settlements negotiated with **our** consent.

**Loss** does not include:

1. Taxes;
2. Any amount for which the **insured** is absolved from legal responsibility to make payment to a third party;
3. Amounts owed under, or assumed by, any contract;
4. The **insured's** future profits or royalties or any return, withdrawal, restitution or reduction of the **insured's** professional fees, profits or other charges;
5. Punitive, liquidated or exemplary damages or the multiplied portion of multiplied damages;
6. Fines, sanctions or penalties;
7. Any matters that are deemed uninsurable under applicable law;
8. The costs to comply with orders granting injunctive or non-monetary relief, including specific performance or any agreement to provide such relief;
9. Disgorgement of any remuneration or financial advantage to which the **insured** was not legally entitled; and
10. Settlements negotiated without **our** consent.

**GG.** **Malicious code** means software intentionally designed to insert itself and damage a **computer system** without the owner's informed consent by a variety of forms including, but not limited to, virus, worm, Trojan horses, spyware, dishonest adware, and crimeware.

**HH.** **Multimedia peril(s)** means the release of, or display of, any **electronic media** on the **insured's** internet site or **print media** for which the **insured** is solely responsible, which directly results in any of the following:

1. Any form of defamation or other tort related to the disparagement or harm to the reputation or character of any person or organization, including libel, slander, product disparagement or trade libel, and infliction of

emotional distress, mental anguish, outrage or outrageous conduct, if directly resulting from any of the foregoing;

2. Invasion, infringement or interference with an individual's right of privacy or publicity, including false light, intrusion upon seclusion, commercial misappropriation of name, person, or likeness, and public disclosure of private facts;
3. Plagiarism, piracy or misappropriation of ideas under an implied contract;
4. Infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name; or
5. Domain name infringement or improper deep-linking or framing.

**II.** **Notification** means notification to individuals in the event of a **security breach** or a **privacy breach**.

**JJ.** **Operational programs** means programs and software which are ready for operational use, having been fully developed, tested, and accepted by the **insured**.

**KK.** **Outsourced IT service provider** means a third party independent contractor that provides information technology services for the **insured's** benefit, under a written contract with the **insured** to provide such services. **Outsourced IT service provider** services include, but are not limited to hosting, security management, co-location, and **data** storage.

**LL.** **Patient notification expenses** means all reasonable and necessary expenses incurred by the **insured**, with **our** prior written consent, to notify affected individuals in the event of a **security breach** or **privacy breach**, whether or not there is a specific legal requirement in the applicable jurisdiction mandating such notification. **Patient notification expenses** includes, but is not limited to: 1) legal expenses; 2) computer forensic and investigation fees; 3) public relations expenses; 4) postage expenses; and 5) related advertising expenses.

**MM.** **Patient support and credit monitoring expenses** means those reasonable and necessary expenses which the **insured** incurs, with **our** prior written consent, for the provision of customer support activity, including the provision of credit file monitoring services and identity theft education and assistance for up to a period of twelve (12) months from the date of enrollment in such credit file monitoring services, in the event of a **privacy breach**.

**NN.** **PCI Data Security Standards** (known as "PCI DSS") means the published **data** security standards in effect now or as hereafter amended, which all merchants and processors must follow when storing, processing and transmitting cardholder **data**.

**OO.** **PCI DSS assessment** means a monetary fine or penalty assessed against the **insured** by an **acquiring bank** or **card association** as a result of a **security breach** or **privacy breach**.

**PP.** **Period of indemnity** means the period commencing with the earlier of the date of **notification** or the first publication of an **adverse media report** (whichever applies), and ending on the earlier of:

1. The date that gross revenues are restored to the level they had been prior to **notification** or the first **adverse media report** (whichever applies); or
2. One hundred eighty (180) consecutive days after the notice of **claim** under Coverage Agreement I is received by **us**.

**QQ.** **Period of restoration** means the period of time that commences on the date when the interruption, degradation or failure of the **insured's computer system** began and ends on the earlier of:

1. The date when the **insured's computer system** is restored or could have been repaired or restored with reasonable speed to the same condition, functionality and level of service that existed prior to the **covered cause of loss** or **act of cyber terrorism**, plus no more than thirty (30) additional consecutive days after the restoration of the **insured's computer system** to allow for restoration of the **insured's** business; or
2. One hundred twenty (120) consecutive days after the notice of **covered cause of loss** or **act of cyber terrorism** is received by **us**.

**RR.** **Print media** means newspapers, newsletters, magazines, books and literary works in any form, brochures or other types of publications, and advertising materials, including packaging, photographs, and digital images.

Healthcare Professional Liability Policy
CyberAssurance Endorsement
©2016 ProAssurance Corporation

**SS.** **Privacy breach** means any of the below, whether actual or alleged, but only if committed or allegedly committed by the **insured** or by others acting on the **insured's** behalf for whom the **insured** is legally responsible, including **BPO service providers** and **outsourced IT service providers**:

1. Breach of confidence, invasion, infringement, interference or violation of any rights to privacy including, but not limited to, breach of the **insured's** privacy policy, breach of a person's right of publicity, false light, intrusion upon a person's seclusion, the failure to properly handle, manage, store, destroy or otherwise control a person's private information in any format or the intrusion or misappropriation of a person's name or likeness for commercial gain; or

2. Any breach or violation of U.S. federal, state or local privacy statutes and regulations, as they currently exist and as amended, associated with the confidentiality, access, control, and use of personally identifiable, non-public information, including, but not limited to:

   a. The Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA"), including Title II which requires protection of confidentiality and security of electronic protected health information, and the rules and regulations promulgated thereunder as they currently exist and as amended, including related state medical privacy laws as they currently exist and as amended;
   b. Gramm-Leach-Bliley Act of 1999 (G-L-B), also known as the Financial Services Modernization Act of 1999, including sections concerning security protection and standards for customer records maintained by financial services companies, and the rules and regulations promulgated thereunder as they currently exist and as amended;
   c. State Attorneys General and Federal Trade Commission enforcement actions regarding the security and privacy of consumer information;
   d. Governmental privacy protection regulations or laws, as they currently exist now or in the future, which require commercial Internet sites or on-line services that collect personal information or medical information (as defined by such laws or acts) to post privacy policies and adopt specific privacy controls or to notify those impacted by identity or **data** theft, abuse or misuse;
   e. Federal and state consumer credit reporting laws, such as the federal Fair Credit Reporting Act (FCRA); or
   f. The Health Information Technology for Economic and Clinical Health Act ("HITECH"), Title XIII of the American Recovery and Reinvestment Act ("ARRA") of 2009.

**TT.** **Privacy breach response costs** means those reasonable and necessary fees and expenses which the **insured** incurs, with **our** prior written consent, for the employment of a public relations consultant, if the **insured** reasonably considers such action is necessary in order to avert or mitigate any actual or potential material damage to the **insured's reputation** or brands, which results or reasonably will result from an **adverse media report**.

**UU.** **Programming error** means an error which occurs during the development or encoding of a computer program, software, or application, which would, when in operation, result in a malfunction or incorrect operation of a **computer system**.

**VV.** **Property damage** means injury to tangible property, including all resulting loss of use of that property, and loss of use of tangible property that is not physically injured.

**WW.** **Public relations expenses** means reasonable and necessary expenses incurred by the **insured** to re-establish such **insured's reputation** which was damaged as a direct result of an **adverse media report**.

**XX.** **Regulatory compensatory award** means a sum of money which the **insured** is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a third party, due to an adverse judgment or settlement arising out of a **government investigation**. **Regulatory compensatory award** does not include a criminal penalty or fine issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

**YY.** **Regulatory fines and penalties** means any administrative fines and penalties that the **insured** is legally required to pay as a result of a **government investigation**.

**ZZ.** **Reputation** means the estimation of trust that patients, customers or clients have in doing business with the **insured** or in purchasing the **insured's** products or services.

**AAA. Security and privacy wrongful act** means any of the below, whether actual or alleged, but only if committed or alleged committed by the **insured**:

1. The failure to prevent or hinder **unauthorized access** to or **unauthorized use** of the **insured's computer system**, security failures, or social engineering techniques devised to trick the user into surrendering personal information ('phishing' or 'pharming') that in turn results in:

   a. The alteration, copying, corruption, destruction, deletion, or damage to electronic **data** stored on the **insured's computer system**;
   b. Theft, loss or unauthorized disclosure electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the **insured's** care, custody or control;
   c. Theft, loss or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of a **BPO service provider** or **outsourced IT service provider** that is holding, processing or transferring such information on the **insured's** behalf; provided, however, that the theft, loss or unauthorized disclosure occurs while the **insured's** written contract with such **BPO service provider** or **outsourced IT service provider** is in effect; or
   d. **Unauthorized use** of or **unauthorized access** to a **computer system** other than the **insured's computer system**;

2. The failure to timely disclose a **security breach** affecting personally identifiable, non-public information, or the failure to dispose of personally identifiable, non-public information within the required time period, in violation of privacy regulations in effect now or in the future;
3. The failure to prevent the transmission of **malicious code** or **computer virus** from the **insured's computer system** to the **computer system** of a third party;
4. A **privacy breach**;
5. The failure to prevent or hinder participation by the **insured's computer system** in a **denial of service attack** directed against internet sites or the **computer system** of any third party; or
6. Loss of employee information.

**BBB. Security breach** means:

1. **Unauthorized access** to, or **unauthorized use** of, the **insured's computer system**, including **unauthorized access** or **unauthorized use** resulting from the theft of a password from the **insured's computer system** or from the **insured**;
2. A **denial of service attack** against the **insured's computer system**; or
3. Infection of the **insured's computer system** by **malicious code** or the transmission of **malicious code** from the **insured's computer system**,

whether any of the foregoing is a specifically targeted attack or a generally distributed attack. A series of continuing **security breaches**, related or repeated **security breaches**, or multiple **security breaches** resulting from a continuing failure of computer security shall be considered a single **security breach** and shall be deemed to have occurred at the time the first of such **security breaches occurred**.

**CCC. Special expenses** means reasonable and necessary costs and expenses which the **insured** incurs to:

1. Prevent, preserve, minimize, or mitigate any further damage to the **insured's digital assets**, including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts that the **insured** retains;
2. Preserve critical evidence of any criminal or malicious wrongdoing;
3. Purchase replacement licenses for **computer programs** because the copy protection system and/or access control software was damaged or destroyed by a **covered cause of loss** or an **act of cyber terrorism**; or
4. Notify the **insured's** patients of a total or partial interruption, degradation in service, or failure of the **insured's computer system** resulting from a **covered cause of loss** or **act of cyber terrorism**.

**DDD. Suit** means a civil proceeding in which damages are alleged against the **insured** which would be covered by this Endorsement. **Suit** includes:

1.  An arbitration proceeding in which such damages are alleged and to which the **insured** must submit or does submit with **our** consent; or
2.  Any other alternative dispute resolution proceeding in which such damages are alleged and to which the **insured** submits with **our** consent.

**EEE. Unauthorized access** means the gaining of access to a **computer system** by an unauthorized person or persons.

**FFF. Unauthorized use** means the use of a **computer system** by unauthorized persons or authorized persons in an unauthorized manner.

**GGG. Waiting period** means:

1.  With respect to Coverage E.b. or G, the eight-hour period of time which must elapse before the recovery of loss can be considered. The **waiting period** applies to each **period of restoration**.
2.  With respect to Coverage I, the two-week period which must elapse after **notification**, or in the event of an **adverse media report**, after publication of the first **adverse media report**, before **brand loss** may be payable. The **waiting period** applies to each **period of indemnity**.


ALL OTHER TERMS AND CONDITIONS OF THE **POLICY** REMAIN THE SAME.

# HEALTH CARE PROFESSIONAL LIABILITY POLICY
# REPORTING ENDORSEMENT -- INSURED PROFESSIONAL

**POLICYHOLDER:** River Valley Forensic Services PA

**POLICY NUMBER:** MP116894

**TERMINATION DATE:** 1/1/2023

This endorsement amends the Professional Liability Coverage Part of the **policy**.

In consideration of an additional premium of ██████, the **insured professional** named below shall be covered, under the terms and conditions of the **policy**, for liability arising from any **professional incident** that occurs on or after the **retroactive date** applicable to each **insured professional**, as stated below, and prior to the above-stated Termination Date, but which is first **reported** on or after the Termination Date.

**Our** limits of liability resulting from **professional incidents** first **reported** on or after the Termination Date shall be as stated below. The limit of liability stated for each **insured professional** as "Each Professional Incident" is the total of **our** liability to the **insured professional** resulting from any one **professional incident** that is first **reported** on or after the Termination Date. The limit of liability stated for each **insured professional** as "Aggregate" is the total of **our** liability to the **insured professional** resulting from all **professional incidents** that are first **reported** on or after the Termination Date.

If Additional Limits of Liability are shown below, the Additional Limits of Liability shall apply only (1) to **professional incidents** that occur on or after the Additional Coverage Retroactive Date shown below for each **insured professional** and (2) after exhaustion of the Primary Limits of Liability applicable to the **insured professional**.

If a "Deductible" is shown for any **insured** below, the **insured** shall be liable for each **professional incident reported** pursuant to this endorsement in an amount equal to the Deductible shown, and **our** limit of liability will be reduced by that amount. The **insured** shall retain liability to third parties for the amount of any deductible, and **we** will only pay that portion of the **damages** that exceeds the amount of the deductible. In the event **we** pay on behalf of an **insured** all or part of the deductible, the **policyholder** or the **insured** shall reimburse **us** for the amount of the payment within thirty (30) days after written demand. The **policyholder** and the **insured** agree to pay all costs, including attorneys' fees and court costs, incurred by **us** in collecting any reimbursement.

Except for nonpayment of premium and acts by an **insured** which render the **policy** terminable by **us** or void, the **Reporting Endorsement** may not be cancelled by **us**.

### INSURED PROFESSIONAL

|  |  | Primary Limits of Liability | |
|---|---|---|---|
| **Name** | Retroactive Date | Each Professional Incident | Aggregate |
| Michael Boyd McGee, M.D. | 3/1/1986 | $1,000,000 | $3,000,000 |

|  |  | Additional Limits of Liability | |
|---|---|---|---|
| **Name** | Retroactive Date | Each Professional Incident | Aggregate |
| Michael Boyd McGee, M.D. | 1/1/2010 | $1,000,000 | $1,000,000 |

# HEALTH CARE PROFESSIONAL LIABILITY POLICY
# CHANGE IN COVERAGE SUMMARY ENDORSEMENT

**POLICYHOLDER:** River Valley Forensic Services PA
300 East University Avenue
Saint Paul, MN 55130

**ENDORSEMENT EFFECTIVE DATE: 01/01/2023**

**ISSUE DATE:  12/15/2022**

**POLICY NUMBER: MP116894**

The total premium charge (or credit) resulting from the changes herein is ▮▮▮.

The **Coverage Summary** for the above-numbered **policy** is hereby amended as follows:

It is understood and agreed that the policy is amended to cancel coverage for Michael Boyd McGee, M.D. effective 1/1/2023. The premium is adjusted accordingly.

### Primary Limits of Liability

| Name | Retroactive Date | Each Professional Incident | Annual Aggregate | Deductible | Premium |
|---|---|---|---|---|---|
| INSURED PROFESSIONALS | | | | | |
| Michael Boyd McGee, M.D. | 3/1/1986 | $1,000,000 | $3,000,000 | ███████ | █████ |

### Additional Limits of Liability

| Name | Retroactive Date | Each Professional Incident | Annual Aggregate | Premium |
|---|---|---|---|---|
| INSURED PROFESSIONALS | | | | |
| Michael Boyd McGee, M.D. | 1/1/2010 | $1,000,000 | $1,000,000 | ████ |

# HEALTH CARE PROFESSIONAL LIABILITY POLICY MEDICARE/MEDICAID BILLING ERRORS & OMISSIONS ENDORSEMENT

**ANNUAL AGGREGATE COVERAGE LIMIT (ALL INSUREDS COMBINED): $25,000**

## I.  DEFINITIONS

Terms appearing in **bold face print** shall have the meanings given in the Definitions section of the **policy**. In addition:

**Appointed counsel** means the attorney or firm of attorneys that, in **our** sole discretion, is either (1) appointed by **us** in writing, or (2) appointed by a **covered insured** with **our** prior written approval, to defend a **covered insured** in any **covered investigation**.

**Compliance program** means a program that substantially complies with all relevant laws or guidelines for the prevention and detection of improper claims for reimbursement under Medicare or Medicaid, including the guidelines described in the U.S. Sentencing Commission's Federal Sentencing Guidelines Manual. The **compliance program** must be kept updated to include any amendments or restatements of the relevant laws or guidelines.

**Costs** means (a) the normal, reasonable and customary charges of the **appointed counsel** in defending a **covered insured** in any **covered incident**, including reasonable out-of-pocket charges incurred by such **appointed counsel**; and (b) reasonable extraordinary expenses incurred by a **covered insured** in responding to a **covered incident**. **Defense costs** does not include damages, fines, judgments or penalties that may be assessed as a result of any **covered incident** or paid in any settlement thereof.

**Covered insured** means any **insured professional** who is a physician, **insured paramedical employee,** or any **insured organization**.

**Covered incident** means an **investigation** of a **negligent billing incident** ;

**Fraudulent** means an intentional misrepresentation or deception.

**Investigation** means an investigation, criminal indictment, civil or administrative proceeding by a governmental unit, or by a private insurer, third-party payor, or third-party administrator that is not affiliated with, working on behalf of, or under the control of the **policyholder** or any **covered insured**. An **investigation** begins at the time a **covered insured** first receives notice that a governmental unit, private insurer, or third-party payor or administrator contemplates or is planning the **investigation**. All **investigations** that involve related claims for reimbursement under Medicare or Medicaid (meaning all claims that are allegedly improper in the same manner due to a common cause, such as the same or similar errors, and those that form a causal chain of event in the alleged impropriety) shall be considered one **investigation**.

**Negligent billing incident** means one or more allegedly improper claims for reimbursement under Medicare or Medicaid for **professional services** provided by a **covered insured** or any person for whom a **covered insured** is legally responsible. All related claims for reimbursement (meaning all claims that are allegedly improper in the same manner due to a common cause, such as the same or similar errors, and those that form a causal chain of event in the alleged impropriety) are considered one **negligent billing incident**, and there is no **negligent billing incident** unless all related claims are submitted to Medicare or Medicaid on or after the **continuous coverage effective date** applicable to the **covered insured** against whom the **covered incident** is asserted.

## II.  INSURING AGREEMENT

**We** will pay on behalf of any **covered insured** the **costs** incurred by the **covered insured** in defending or responding to a **covered incident**, provided that:

1.  the **covered incident** begins on or after the **continuous coverage effective date** applicable to the **covered insured** and prior to the termination of the **policy**;

2.  the **covered insured** first receives written notice of the **covered incident** within the **policy period**; and

3.  the **covered incident** is first reported to **us** during the **policy period**;

and further provided that:

1. the share of **costs we** will pay will equal the ratio of (a) the period of the **negligent billing incident** during which the **covered insured** has a **compliance program** in place to (b) the complete duration of the **negligent billing incident**, both of which shall be determined at **our** reasonable discretion; for example, if the **covered insured** operates under a **compliance program** for one year of a three year period that is the subject of the **investigation**, we will pay one-third of the **costs** incurred in the **investigation**; and

2. if the **investigation** includes allegations in addition to or beyond the scope of the **negligent billing incident**, **we** will pay only for the proportionate share of **costs** attributable to the **negligent billing incident**, based on the number of Medicare or Medicaid claims under investigation in comparison to the other allegations, or on a basis mutually agreeable to the **policyholder** and **us**.

We will pay **legal expenses** contemplated herein (1) directly to **appointed counsel** if **we** elect to appoint such counsel or (2) to the **covered insured** upon presentation of **appointed counsel's** invoices and evidence of payment by the **covered insured** if **we** elect to reimburse costs of **appointed counsel** selected by the **covered insured.**

## III.  LIMITS OF LIABILITY

The Annual Aggregate Coverage Limit stated above is the total limit of **our** liability to all **covered insureds** combined for all **covered incidents** to which this endorsement applies.

## IV.  EXCLUSIONS

In addition to the other exclusions contained in the **policy**, this endorsement shall not apply to any **negligent billing incident** that includes **fraudulent** acts by a **covered insured**.

## V.  DUTIES

To qualify for coverage provided by this endorsement, the  **covered insured** must:

1. give **us** notice of any **covered incident** as soon as practicable;

2. terminate any improper Medicare or Medicaid claim practices as soon as they are known to, or reasonably should be discovered by, the **covered insured**; and

3. repay any third-party payor who improperly overpaid the **covered insured** as a result of a **negligent billing incident**;

## VI.  NO REPORTING ENDORSEMENT AVAILABLE

No **Reporting Endorsement** is available for the coverage provided in this endorsement.  The coverage provided herein shall terminate at the end of the **policy period**.  If this endorsement is attached to a policy providing Health Care Professional Liability coverage on an occurrence basis, no coverage is provided hereunder for any **covered incident** that begins after the **policy period** ends.

# HEALTH CARE PROFESSIONAL LIABILITY POLICY
# UNSCHEDULED PARAMEDICAL EMPLOYEE ENDORSEMENT

The **policy** is hereby amended as follows:

For purposes of this endorsement, an "Unscheduled Paramedical Employee" means any individual who (1) is employed by an **insured organization** or an **insured professional**; (2) is not a physician, surgeon, or dentist; (3) is not an **other covered employee**; and (4) is not named in the **Coverage Summary** as an **insured paramedical employee** but otherwise satisfies **our** criteria for classification as an **insured paramedical employee**.

Notwithstanding any other provision of the **policy**, an Unscheduled Paramedical Employee shall share the coverage provided to the **insured organization** or **insured professional** that employs the Unscheduled Paramedical Employee, provided that an Unscheduled Paramedical Employee is covered only for **professional incidents** that occur on or after the **retroactive date** applicable to the **insured organization** or **insured professional** that employs the Unscheduled Paramedical Employee and while the Unscheduled Paramedical Employee is actually employed by the **insured organization** or **insured professional** and acting within the scope of that employment and while engaged in the performance of **professional services** that the Unscheduled Paramedical Employee holds any required license to perform.

If **damages** covered by the **policy** are awarded, or a settlement is made with **our** consent, against one or more Unscheduled Paramedical Employees and one or more **insured organizations** and **insured professionals**, the total insurance coverage available to all Unscheduled Paramedical Employees, all **insured organizations** and all **insured professionals** combined shall not exceed the limit of **our** liability under the **policy** for the **insured organizations** and **insured professionals** that are parties to the award or settlement.  In such a case, if a Deductible applies to one or more **insured organizations** and **insured professionals**, the total Deductible amount to be paid by all Unscheduled Paramedical Employees, all **insured organizations** and all **insured professionals** combined shall equal the sum of the Deductibles applicable to the **insured organizations** and **insured professionals** that are parties to the award or settlement.

If **damages** covered by the **policy** are awarded, or a settlement is made with **our** consent, against one or more Unscheduled Paramedical Employees but not against any **insured organizations** or **insured professionals**, the insurance coverage available to all Unscheduled Paramedical Employees combined shall equal the limit of **our** liability under the **policy** for the **insured organization** or **insured professional** that employs the Unscheduled Paramedical Employee(s).  In such a case, the total Deductible amount to be paid by the Unscheduled Paramedical Employee(s) shall equal the Deductible, if any, applicable to the **insured organization** or **insured professional** that employs the Unscheduled Paramedical Employee(s).

In no event will **we** pay any **damages** or provide a defense to any employee once the "annual aggregate" limit of **our** liability has been paid on behalf of the **insured organization** or **insured professional** that employs the Unscheduled Paramedical Employee.

No Unscheduled Paramedical Employee shall have the right to purchase a **Reporting Endorsement** upon cancellation, non-renewal, or expiration of the coverage provided to the Unscheduled Paramedical Employee.

# HEALTH CARE PROFESSIONAL LIABILITY POLICY
# RENEWAL ENDORSEMENT

**POLICYHOLDER: River Valley Forensic Services PA**

**RENEWAL DATE: 1/1/2022**

**POLICY NUMBER: MP116894**

This renewal of the **policy** is offered under certain conditions and in reliance upon the initial application and any subsequent applications each **insured** and the **policyholder** provided to **us**.

Further, as a condition to renewal of the **policy**, the **policyholder** and each **insured** represent and warrant that, except as otherwise disclosed to **us** in writing:

A.  no **insured** has had any state medical license, hospital privileges or license to prescribe or dispense medicine denied, suspended, restricted or revoked, nor has any such **insured** voluntarily surrendered any such license or privileges for any reason;

B.  no **insured** has (1) undergone psychiatric treatment, (2) been treated for alcohol or narcotics addiction, (3) had any chronic illness or physical defect, (4) been convicted of any misdemeanor or felony other than minor traffic violations, (5) appeared before any Professional Standards/Quality Assurance Review Committee or (6) appeared before any Board of Professional Examiners or Licensure Commission; and

C.  no **insured** has changed the scope of his or her professional practice from that previously disclosed to **us** in his or her applications for insurance.

If, at any time while the **policy** is in effect, any of the events described in paragraph A, B, or C occur, the **policyholder** agrees to notify **us** within thirty (30) days of its occurrence, and to provide such additional information as **we** may require.

The **policyholder** acknowledges that information concerning any of the events described above is material to **our** agreement to provide insurance under the **policy** on the basis, and for the premium, stated in the **Coverage Summary**.

# HEALTHCARE PROFESSIONAL LIABILITY POLICY
# CLAIMS-MADE FORM
# MINNESOTA STATE AMENDATORY ENDORSEMENT

I.  The definition of **report**, **reported**, and **reporting**, form PRA-HCP-031 or PRA-HCP-040, is hereby replaced with the following:

**Report**, **reported**, and **reporting** mean, when used with respect to a **professional incident**, the giving by an **insured** or his or her representative of notice of the **professional incident**, either in writing or by telephone to **our** Claims Department or to the agent of record, specifying (1) the date, time, and place of the **professional incident**, (2) a description of the **professional incident**, (3) the name, address, and age of the patient or claimant, (4) the names of witnesses, including other treating physicians, and (5) the circumstances resulting in the **professional incident**.  A **professional incident** shall be deemed **reported** on the date the **report** is actually received by **our** Claims Department or the agent of record.  A **professional incident** that is not the subject of an **assertion of liability** must be reported within 30 days of the date on which the **professional incident** occurred; after the expiration of this 30-day period the **professional incident** cannot be **reported** to trigger coverage unless the **insured** has received an **assertion of liability**.

II. Paragraph A of Item V. SUPPLEMENTARY PAYMENTS of the Professional Liability Coverage Part, form PRA-HCP-031 or PRA-HCP-040, is hereby replaced with the following:

A.  all expenses incurred by **us**, all costs taxed against an **insured** in any suit defended by **us**, prejudgment interest or interest accruing on a judgment or award against an **insured** before **we** have paid, tendered, or deposited in court that part of the judgment which does not exceed the limit of **our** liability thereon; provided that (1) **we** reserve the right to seek reimbursement from the **insured** for the costs and expenses **we** incur in defending any claim that is not covered by the **policy**; and (2) **we** will pay interest only on that portion of the judgment or award that does not exceed the applicable limit of liability;

III. The last paragraph of Item IV. INSUREDS' DUTIES of the General Conditions, form PRA-HCP-031 or PRA-HCP-040, is hereby deleted.

IV. Item V. CLAIMS AGAINST US of the General Conditions, form PRA-HCP-031 or PRA-HCP-040, is hereby amended by replacing the sentence:

Bankruptcy or insolvency of any **insured** or any **insured's** estate shall not relieve **us** of any of **our** obligations hereunder.

with the following:

Bankruptcy, insolvency, or financial dissolution of any **insured** or any **insured's** estate shall not relieve **us** of any of **our** obligations hereunder.

V.  Item VII. SUBROGATION of the General Conditions, form PRA-HCP-031 or PRA-HCP-040, is hereby amended by adding the following:

**Our** rights do not apply against any person insured under this or any other coverage part **we** issue with respect to the same **professional incident**.

VI. Item X. CANCELLATION of the General Conditions, form PRA-HCP-031 or PRA-HCP-040, is hereby replaced with the following:

This **policy**, or coverage of any **insured** thereunder, may be canceled by the **policyholder** by mailing to **us** written notice stating when thereafter the cancellation shall be effective. This **policy**, or coverage of any **insured** thereunder, may be canceled by **us** by mailing to the **policyholder**, at the address shown in the **Coverage Summary**, written notice stating when the cancellation shall be effective.  If **we** cancel the **policy**, or coverage of any **insured** thereunder, for failure of the **policyholder** to pay premiums, or when the **policy**, or coverage of any

**insured** thereunder, has been in effect for less than 90 days, the notice of cancellation shall be given at least ten (10) days prior to the date of cancellation. Otherwise, the notice of cancellation shall be given at least sixty (60) days prior to the date of cancellation.

If the **policy** has been in effect ninety (90) days or more, it may not be canceled by **us** without the prior written consent of the **policyholder**, except for any one of the following reasons:

1.  Nonpayment of premium;

2.  Misrepresentation or fraud by or with the knowledge of the **insured** in obtaining the **policy** or pursuing a claim under the **policy**;

3.  Actions by the **insured** that have substantially increased or substantially changed the risk insured;

4.  Refusal to eliminate known conditions that increase the potential for loss after notification by **us** that the condition must be removed;

5.  Substantial change in the risk assumed, except to the extent that **we** reasonably should have foreseen the change or contemplated the risk in writing the **policy**;

6.  **Our** loss of reinsurance which provided coverage to **us** for a significant amount of the underlying risk insured;

7.  A determination by the Commissioner of Commerce that the continuation of the **policy** could place **us** in violation of the insurance laws of this state; or

8.  Nonpayment of dues to an association or organization, other than an insurance association or organization, where payment of dues is a prerequisite to obtaining or continuing the insurance. This provision for cancellation for failure to pay dues does not apply to persons who are retired at 62 years of age or older or who are disabled according to Social Security standards.

The effective date and hour of cancellation stated in the notice shall become the end of the **policy period** for each **insured** to which the cancellation applies. Proof of mailing of any notice shall be sufficient proof of notice. Delivery of written notice either by the **policyholder** or by **us** shall be equivalent to mailing. If the **policyholder** cancels, earned premium shall be computed in accordance with the short rate procedure as filed with the Commissioner of Commerce. If **we** cancel, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

VII.   Item XI. RENEWAL OF POLICY of the General Conditions, form PRA-HCP-031 or PRA-HCP-040, is hereby replaced with the following:

Neither the **policyholder** nor **we** have any obligation to renew the **policy**. Any renewal will be on the policy forms and endorsements then in effect. If **we** elect not to renew the **policy**, or coverage of any **insured** thereunder, **we** will mail or deliver to the **policyholder**, at the address shown in the **Coverage Summary**, notice of **our** action at least sixty (60) days prior to the end of the **policy period**. If **we** offer to renew the **policy** at less favorable terms as to the dollar amount of coverage or deductibles, higher rates, or a higher rating plan, **we** will mail or deliver to the **policyholder**, at the address shown in the **Coverage Summary**, notice of **our** action at least thirty (30) days prior to the end of the **policy period**. Proof of mailing of any notice shall be sufficient proof of notice.

VIII.   Item XII. FRAUD AND MISREPRESENTATIONS of the General Conditions, form PRA-HCP-031 or PRA-HCP-040, is hereby replaced with the following:

By acceptance of this **policy**, the **policyholder** and all **insureds** agree that the statements in the **Coverage Summary**, in their respective applications or renewal applications for insurance, and in any other material submitted to **us** in order to secure insurance coverage, are their agreements and representations, that this **policy** is issued in reliance upon the truth of such representations, and that this **policy** embodies all agreements existing between themselves and **us** or any of **our** agents relating to this insurance. No misrepresentation or omission made by an **insured** or on an **insured's** behalf shall be deemed material unless it is made with intent to deceive and defraud or increases the risk of loss. In the event of any material fraud, misrepresentation, or omission by any **insured** in any application, renewal application, or other material submitted to **us** to obtain insurance, this **policy** is void as to that **insured**, no coverage is afforded to that **insured**, and that **insured** shall have no right to purchase a **Reporting Endorsement**.